Argued and submitted March 4, 2004, decision of Court of Appeals affirmed; judgment of circuit court affirmed; case remanded to circuit court for resentencing consistently with Court of Appeals opinion May 11, 2006

## STATE OF OREGON,
*Respondent on Review,*

*v.*

## DAVID ALLEN COOK,
*Petitioner on Review.*

## (CC 961037561; CA A106503; SC S49851)

135 P3d 260

531-a

Rankin Johnson, IV, Deputy Public Defender, Salem, argued the cause for petitioner on review. With him on the briefs were Peter A. Ozanne, Executive Director, Peter Gartlan, Chief Defender, and David E. Groom, Deputy Public Defender, Office of Public Defense Services.

Janet A. Metcalf, Assistant Attorney General, Salem, argued the cause for respondent on review. With her on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Before Carson,** Chief Justice, and Gillette, Durham, Riggs, De Muniz,*** and Balmer, Justices.****

CARSON, J.

---

\*\* Chief Justice at the time of argument.

\*\*\* Chief Justice at the time the decision was issued.

\*\*\*\* Kistler, J., did not participate in the consideration or decision of this case.

## CARSON, J.

At issue in this criminal case is whether the admission of hearsay statements by two codefendants who did not testify at defendant's criminal trial violated defendant's right "to meet the witnesses face to face" under Article I, section 11, of the Oregon Constitution, or his right "to be confronted with the witnesses against him" under the Sixth Amendment to the United States Constitution. During defendant's trial, the trial court allowed the state to introduce hearsay statements by defendant's two codefendants. Defendant was convicted and appealed, primarily claiming that the admission of those statements violated his confrontation rights under both the state and federal constitutions. In a per curiam opinion, the Court of Appeals affirmed defendant's conviction despite the admission of those statements. *State v. Cook*, 183 Or App 237, 51 P3d 673 (2002). We allowed defendant's petition for review and affirm the decision of the Court of Appeals and the judgment of the trial court.

## I. FACTS AND PROCEDURAL HISTORY

On October 2, 1996, police discovered the bodies of two murdered men near a Larch Mountain rock quarry that commonly was used as a place for target shooting. One had a gunshot wound to his head and five or six additional gunshot wounds to his body; the second had 13 gunshot wounds to various parts of his body.

The police officers investigating the murders identified defendant and his two codefendants, Gregory and Lewis, as suspects. Witnesses described seeing a vehicle that matched Gregory's at the scene of the murders, and Gregory had made a telephone call to the police on the night of the murders, informing them that he had information about the crime.

Later, after Gregory made inculpatory statements about the murders when the officers questioned him, the police gave him *Miranda* warnings and arrested him. While in custody, Gregory made two recorded statements to the police. In those statements, Gregory stated that he, defendant, and Lewis had gone to Larch Mountain for target shooting. A short time later, the two victims arrived and also

began target shooting. Gregory reported that, after speaking with the victims briefly, he and Lewis were walking with their backs to defendant when Gregory heard gunfire and turned to see one of the victims lying on the ground. According to Gregory, the other victim was looking in Gregory's direction and holding a gun. Gregory attempted to shoot at that victim, but the victim hid behind a pile of gravel before Gregory could fire. Gregory stated that he and Lewis then fled into the woods. When he came out of the woods, Gregory encountered one of the victims lying on the ground, wounded but still moving, and he shot that victim in the head to "put him out of his misery[.]" Gregory also stated that, after the killings, defendant had claimed that he had shot the victims because one of the victims had pointed his gun at Gregory. However, Gregory admitted that defendant might have shot the victims just for the thrill of shooting someone and that he, defendant, and Lewis had discussed shooting someone earlier that day and had discussed specifically shooting those victims.

The police also went to Lewis's residence and asked to speak with him about the murders. After the police gave him *Miranda* warnings, Lewis made a recorded statement to the police in which he reported that he, Gregory, and defendant had talked about shooting someone earlier on the day of the shootings and had discussed shooting the victims a short time before they were shot. Lewis claimed that defendant had said that he felt energized ("pumped") about shooting the victims. Lewis also admitted that he had shot one of the victims twice in the back.

Later, the police arrested defendant. Defendant admitted that he had shot the victims, but he claimed that he had done so in Gregory's defense.

For the deaths of the victims, the state charged defendant, Gregory, and Lewis with multiple counts of aggravated murder and informed the trial court that it would be seeking the death penalty for each defendant. Prior to defendant's trial, Gregory and Lewis pleaded guilty to several counts of aggravated murder. Their plea agreements did not require them to testify against defendant at his trial.

Before his trial, defendant moved to exclude the statements that Gregory and Lewis had made to the police,

claiming that the statements, if offered against him for the truth of their content, would be inadmissible hearsay and, if admitted, would violate his confrontation rights under the state and federal constitutions. The trial court denied that motion, concluding that the statements of Gregory and Lewis were admissible under the "against penal interest" exception to the hearsay rule.

At defendant's pretrial hearing, Gregory and Lewis invoked their Fifth Amendment rights against self-incrimination and refused to testify. Both further stated that they would continue to invoke their Fifth Amendment rights if called as witnesses at defendant's trial. At defendant's trial, the state offered—and the trial court admitted—the testimony of a police officer describing Gregory's recorded statement, as well as an audiotape recording of that statement. The state also offered—and the trial court again admitted—another officer's testimony describing Lewis's statement and an audiotape recording of Lewis's post-arrest statement.

After the trial, a jury found defendant guilty of three counts of aggravated murder and determined that defendant should be sentenced to "true life" imprisonment pursuant to ORS 163.105. Defendant appealed, but the Court of Appeals affirmed his convictions, remanding only for entry of corrected sentences. *Cook*, 183 Or App at 238. Defendant then petitioned this court for review.[1]

This court allowed defendant's petition for review and took the case under advisement on March 4, 2004. Shortly thereafter, on March 8, 2004, the United States Supreme Court issued its decision in *Crawford v. Washington*, 541 US 36, 124 S Ct 1354, 158 L Ed 2d 177 (2004). In *Crawford*, the Court reconsidered its 1980 decision in *Ohio v. Roberts*, 448 US 56, 100 S Ct 2531, 65 L Ed 2d 597 (1980). *Roberts* had held that the Confrontation Clause of the Sixth Amendment to the United States Constitution permitted the admission of out-of-court hearsay statements if two conditions were met: (1) the declarant must have been unavailable

---

[1] The state has not petitioned separately for review, so no issues related to the Court of Appeals' rationale for remanding the case for resentencing are before us.

to testify at trial; and (2) the statements must have carried "adequate indicia of reliability," either because those statements fell within a "firmly rooted hearsay exception" or because they otherwise possessed "particularized guarantees of trustworthiness." *Id.* at 66.

In *Crawford*, after reexamining the historical underpinnings of the federal constitutional right to confrontation in criminal prosecutions, the Supreme Court determined that the *Roberts* "reliability" requirement for the admission of hearsay evidence did not satisfy the Sixth Amendment when "testimonial evidence" was at issue. *Crawford*, 541 US at 42-56, 61. Specifically, the Court held:

> "Where nontestimonial hearsay is at issue, it is wholly consistent with the Framers' design to afford the States flexibility in their development of hearsay law—as does *Roberts*, and as would an approach that exempted such statements from Confrontation Clause scrutiny altogether. Where testimonial evidence is at issue, however, the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination."

*Id.* at 68.

The Supreme Court's decision in *Crawford* overruled its contrary prior cases. Additionally, this court's jurisprudence relating to the state constitutional right to confrontation in criminal prosecutions under Article I, section 11, derived from and followed those Supreme Court precedents.[2] We therefore asked the parties in this case to submit supplemental briefing respecting the impact of *Crawford* on our deliberations. In doing so, this court asked both the state and defendant to consider the following questions:

> "(1) Whether and to what extent the Supreme Court's decision in *Crawford* impacts this court's analysis in [this case] under the Confrontation Clause of the Sixth Amendment to the United States Constitution;
>
> "(2) Whether this court should re-examine its case law concerning the 'reliability' requirement respecting an

---

[2] *See, e.g., State v. Nielsen*, 316 Or 611, 622-23, 853 P2d 256 (1993); *State v. Campbell*, 299 Or 633, 648, 705 P2d 694 (1985).

accused person's right 'to meet witnesses face to face' under Article I, section 11, of the Oregon Constitution; and

"(3)   If 'yes' to question (2), how the court should construe the wording of the right 'to meet witnesses face to face' under Article I, section 11, of the Oregon Constitution."

In response to that request, both parties prepared and submitted additional briefing addressing each of those questions.[3] We turn now to an analysis of the various issues presented.

## II.   ANALYSIS

■     This court first considers a defendant's statutory claims, if any; next, the court considers a defendant's state constitutional claims; and, finally, the court considers a defendant's federal constitutional claims. *See State v. Nielsen*, 316 Or 611, 618, 853 P2d 256 (1993) (describing that paradigm).

### A.   *Oregon Evidence Code*

■     As noted, defendant claims at the outset that the statements of Gregory and Lewis were inadmissible hearsay under the Oregon Evidence Code. " 'Hearsay' is a statement, other than one made by the declarant while testifying at trial or hearing, offered in evidence to prove the truth of the matter asserted." OEC 801(3). The statements that Gregory and Lewis made to the police were offered for their truth, *i.e.*, they were offered to prove that defendant did not act in defense of Gregory when he shot the victims because defendant previously had discussed shooting someone.[4] Therefore, the statements were hearsay. Hearsay statements are not admissible

---

[3] Although addressing all the questions, none of the responses contained a principled, in-depth review of Oregon precedents with the purpose of persuading this court to reexamine its Article I, section 11, jurisprudence in this area. We therefore leave to another day the question whether, in fact, *Crawford* is also a correct statement of Oregon law. *See State v. Ciancanelli*, 339 Or 282, 290-91, 121 P3d 613 (2005) (discussing role of *stare decisis* and circumstances under which this court will reconsider its prior decisions).

[4] The state argues that defendant failed to identify the statements that he claims were improperly admitted and, therefore, waived his objection. Although defendant's objections were not a model of clarity, we conclude that he identified the statements that he found objectionable with sufficient specificity to permit review of the issues.

as evidence in Oregon courts in the face of a timely objection to their admission, unless the statements fit within one of the exceptions provided by the Oregon Evidence Code or provided by another source of law. OEC 802.

OEC 804(3)(c) sets forth the "against penal interest" exception to the hearsay rule. That exception provides that a hearsay statement is admissible "if the declarant is unavailable as a witness" (OEC 804(3)) and if the statement "at the time of its making * * * so far tended to subject the declarant to * * * criminal liability * * * that a reasonable person in the declarant's position would not have made the statement unless the person believed it to be true." OEC 804(3)(c).

This court applies a two-part standard of review to a trial court evidentiary ruling that a statement fits within an exception to the hearsay rule. *State v. Cunningham*, 337 Or 528, 538-39, 99 P3d 271 (2004). The court will uphold the trial court's preliminary factual determinations if any evidence in the record supports them. *Id.* at 537. However, the court reviews the trial court's ultimate legal conclusion, as to whether the hearsay statement is admissible under an exception to the hearsay rule, to determine if the trial court made an error of law. *Id.* at 538.

Returning to the present case, we first must determine whether Gregory and Lewis were "unavailable" for the purposes of OEC 804. A declarant is unavailable as a witness if, *inter alia*, the declarant "[i]s exempted by ruling of the court on the grounds of privilege from testifying concerning the subject matter of a statement[.]" OEC 804(1)(a). As noted, at defendant's pretrial evidentiary hearing, both Gregory and Lewis invoked their Fifth Amendment rights. They also stated that they would assert their Fifth Amendment rights at defendant's trial if they were called as witnesses. Under those circumstances, the trial court correctly held that Gregory and Lewis were unavailable.[5] *See State v. Rawls*,

---

[5] The state and defendant both agree that Gregory and Lewis were unavailable; thus, we are not called upon here to decide whether the assertion of privilege by Gregory and Lewis was valid. We note, however, that this court previously has held that a witness who has been convicted of a crime and has exhausted his direct appeals may not assert his Fifth Amendment privilege against self-incrimination to avoid answering questions about that crime. *State v. Barone*, 329 Or 210, 232, 986 P2d 5 (1999).

252 Or 556, 558-63, 451 P2d 127 (1969) (holding that assertion of privilege to be free from compelled self-incrimination makes declarant unavailable).

Next, we turn to the second criterion for admissibility under OEC 804(3)(c), that is, whether the declarant's statement tends to subject him to criminal liability. Gregory admitted to shooting one of the victims in the head and admitted that, earlier in the day, he had spoken with the defendant and Lewis about shooting someone. Lewis admitted to shooting one of the victims twice in the back and admitted that he had been part of the earlier discussion about shooting someone. Those statements potentially subjected Gregory and Lewis to criminal liability.

Defendant claims that some parts of the statements made by Gregory and Lewis were not self-inculpatory in that they only inculpated the defendant. Defendant appears to ask us to parse a declarant's statement into single sentences or phrases and to examine each sentence or phrase wholly independent of its context. This court previously has rejected such an approach, and defendant has offered nothing in his arguments that persuades us to alter that view. *See State v. Wilson*, 323 Or 498, 512 n 9, 918 P2d 826 (1996) (refusing to follow United States Supreme Court's interpretation of FRE 804(3)(c) that noninculpatory parts of broader narrative are not admissible under "against-penal-interest" hearsay exception). In fact, this court has "held that, under OEC 804(3)(c), a declarant's hearsay statements that were against the declarant's penal interest and that also inculpated a criminal defendant were admissible in the defendant's criminal trial." *Wilson*, 323 Or at 512 (citing *Nielsen*, 316 Or at 620-21). The statements of Gregory and Lewis were both self-inculpatory and inculpated defendant. Therefore, the trial court correctly held that the second requirement for admissibility under OEC 804(3)(c) was satisfied.

■ Finally, we examine the third requirement for admissibility under OEC 804(3)(c), that is, whether a reasonable person in declarant's position would not have made the statement unless he or she believed that it was true, by considering the circumstances under which the statement was made. *See Nielsen*, 316 Or at 620-21 (evaluating surrounding

circumstances at time of statement). In carrying out our analysis, we consider whether the declarant made the statement while in custody; whether the police conducted a lengthy interrogation and gave the declarant *Miranda* warnings; whether the statement was detailed and made soon after the crime; whether the declarant described his role in the crime or tried to shift blame to the defendant; and whether the declarant exposed himself to the same level of criminal liability as the defendant. *Nielsen*, 316 Or at 620-21; *Wilson*, 323 Or at 513.

Although Gregory and Lewis made their statements while in police custody and under police interrogation, other surrounding circumstances support the trial court's conclusion that a reasonable person in the declarant's position would not have made the statements unless he believed that they were true. *See Nielsen*, 316 Or at 620 (discussing concern for statements made while in custody but still finding them admissible). This court previously has stated, "We decline to adopt a *per se* rule invalidating all hearsay 'confessions' made in custody * * *." *Nielsen*, 316 Or at 624.

Gregory and Lewis made their formal statements after receiving *Miranda* warnings, and both knew that their statements could be used against them. Gregory and Lewis were not offered leniency for their statements. Both of their statements were detailed and were made within hours after the crime. Gregory and Lewis exposed themselves to the same degree of criminal liability as defendant by describing their roles in the crime; Gregory admitted to shooting one of the victims in the head, and Lewis admitted to shooting one of the victims twice in the back. Furthermore, Gregory was not evasive or defensive; he actually initiated contact with the police by calling them on the telephone the night of the murders. Similarly, Lewis was not evasive or defensive; he freely answered the police officers' questions. Finally, Lewis was aware of the consequences of his statement, as he acknowledged that he likely would be charged with murder.

Those circumstances support the trial court's conclusion that a reasonable person in either declarant's position would not have made the statements that each made unless he believed that they were true. We therefore conclude that,

under OEC 804(3)(c), the statements of Gregory and Lewis were admissible as statements against penal interest.

B. *Article I, section 11, of the Oregon Constitution*

■■    Article I, section 11, of the Oregon Constitution provides, in part: "In all criminal prosecutions, the accused shall have the right * * * to meet the witnesses face to face * * *." To determine if the admission of out-of-court statements made by a declarant who is not testifying violates a defendant's Article I, section 11, rights under the Oregon Constitution, this court has relied upon the test announced by the United States Supreme Court in *Roberts*, 448 US 56. *State v. Campbell*, 299 Or 633, 648, 705 P2d 694 (1985). As mentioned above, the *Roberts* test contains two requirements. First, the declarant must be unavailable, and, second, the declarant's statement must have "adequate indicia of reliability." *Id.* (quoting *Roberts*, 448 US at 66). A statement is considered reliable when it falls within a "firmly rooted hearsay exception" or when it is accompanied by "particularized guarantees of trustworthiness." *Nielsen*, 316 Or at 623 (quoting *Roberts*, 448 US at 65-66).

Although the United States Supreme Court no longer adheres to the *Roberts* test in the context of the Sixth Amendment Confrontation Clause, we continue to use it to analyze Confrontation Clause claims under Article I, section 11, of the Oregon Constitution:

> "This court's holding in *Nielsen*—applying the test articulated by the United States Supreme Court in *Ohio v. Roberts* to analyze indicia of reliability and trustworthiness under Article I, section 11—is not modified by subsequent decisions of the United States Supreme Court. *See State v. Caraher*, 293 Or 741, 749, 653 P2d 942 (1982) ('[w]hen this court gives Oregon law an interpretation corresponding to a federal opinion, our decision remains the Oregon law even when federal doctrine later changes')."

*Wilson*, 323 Or at 514 n 10. "This court has noted the United States Supreme Court's [previous] departure[s] from *Roberts*, but has continued to apply the [*Roberts* test] to its analysis of confrontation issues under Article I, section 11." *State v. Moore*, 334 Or 328, 336, 49 P3d 785 (2002).

As we previously have discussed, Gregory and Lewis would not have testified at defendant's trial. Therefore, Gregory and Lewis were unavailable under Article I, section 11.

We now consider the second requirement of the *Roberts* test, *i.e.*, reliability. This court has not determined previously whether a statement against penal interest falls within a "firmly rooted hearsay exception," but we need not reach that issue here, because, as described below, the statements of Gregory and Lewis contained particularized guarantees of trustworthiness, satisfying the second part of the test for reliability. *See Nielsen*, 316 Or at 623 (noting that no cited authority supported conclusion that statement against penal interest falls within a "firmly rooted hearsay exception").

In *Nielsen*, this court held that a declarant's statement contained particularized guarantees of trustworthiness if the statement clearly subjected the declarant to criminal liability and the record contained no evidence that the declarant had a motive to lie. *Id.* To determine whether the declarant had a motive to lie, this court considered whether the declarant tried to shift the blame to another; whether the police promised the declarant leniency or tried to intimidate him; whether the declarant was unaware of the consequences of his statement; whether the declarant had been given *Miranda* warnings; and whether the statement was the product of protracted interrogation or a plea bargain. *Id.* at 623-24.

Like the declarant in *Nielsen*, the statements of Gregory and Lewis subjected them to criminal liability. Gregory admitted to shooting one of the victims in the head, and Lewis admitted to shooting one of the victims twice in the back. Furthermore, the record contains no suggestion that either had a motive to lie. Examination of the record reveals that neither Gregory nor Lewis attempted to shift blame to the defendant but, instead, exposed themselves to the same level of criminal liability as the defendant. In fact, Lewis was well aware of the consequences of his statement, acknowledging that he likely would be charged with murder. Furthermore, the police made no promises of leniency, and the statements were not made as part of a plea bargain. The police

gave Gregory and Lewis *Miranda* warnings, and both gave detailed statements within hours after the murders. Finally the police did not attempt to intimidate Gregory or Lewis; Lewis even stated that "both of the officers were extremely polite."

The facts contained in the record lead us to conclude that the statements of Gregory and Lewis contained adequate indicia of reliability under Article I, section 11. The trial court therefore was entitled to conclude, as it did, that the admission of those statements under OEC 804(3)(c) did not violate defendant's rights under Article I, section 11, of the Oregon Constitution.

C. *Sixth Amendment to the United States Constitution*

■ The Sixth Amendment to the United States Constitution provides, "In all criminal prosecutions, the accused shall enjoy the right * * * to be confronted with the witnesses against him * * *." In *Crawford*, the United States Supreme Court rejected the Confrontation Clause test that it had announced in *Roberts*, 448 US 56, and construed the Sixth Amendment Confrontation Clause to apply primarily to "testimonial" hearsay statements admitted in criminal trials against a defendant.[6] *Crawford*, 541 US at 53, 60-61. Conversely, if a hearsay statement is not "testimonial," then the Sixth Amendment Confrontation Clause does not apply. *See id.* at 68 (suggesting such an approach). Although the Supreme Court did not comprehensively define the word "testimonial," the Court concluded that a "recorded statement, knowingly given in response to structured police questioning, qualifies under any conceivable definition." *Id.* at 52, 53 n 4. *Crawford* went on to hold that a testimonial hearsay statement is admissible under the Sixth Amendment Confrontation Clause only if the declarant is unavailable and the defendant had a prior opportunity to cross-examine the declarant. *Id.* at 68.

---

[6] The Court declined to delineate the exact boundaries of the Sixth Amendment confrontation right, stating, "even if the Sixth Amendment is not solely concerned with testimonial hearsay, that is its primary object[.]" *Crawford v. Washington*, 541 US 36, 53, 124 S Ct 1354, 158 L Ed 2d 177 (2004).

In *Crawford,* the police questioned the declarant while she was in their custody. *Id.* at 65. In response, she made a statement implicating herself and the defendant in a crime and undermining the defendant's self-defense claim. *Id.* at 39-40, 65. After the declarant asserted a privilege and refused to testify, the trial court admitted the declarant's statement under the "against penal interest" hearsay exception. *Id.* at 40. The Supreme Court held that the statement was testimonial because the declarant had made it while in police custody and in response to police questioning. *Id.* at 53 n 4, 61. The Court further concluded that the second requirement for admission of a testimonial hearsay statement was missing because "the State admitted [the] testimonial statement against [the defendant], despite the fact that he had no opportunity to cross-examine [the declarant]." *See id.* at 68. Therefore, the Court concluded that admission of the statement violated the defendant's Sixth Amendment confrontation right. *Id.* at 68.

The present case is closely analogous to *Crawford.* Here, the declarants, Gregory and Lewis, made statements while in police custody and in response to police questioning. The statements inculpated Gregory, Lewis, and defendant in a crime and undermined defendant's defense-of-others claim. By asserting their rights against self-incrimination, Gregory and Lewis did not testify at defendant's trial, and the trial court admitted the statements of Gregory and Lewis under the hearsay exception for statements against penal interest. Under *Crawford,* those statements were testimonial because Gregory and Lewis made them while in police custody and in response to police questioning. Thus, although the first requirement for admitting testimonial hearsay under *Crawford* was met, because Gregory and Lewis were unavailable, the second requirement was not met, because defendant had no opportunity to cross-examine Gregory and Lewis. Therefore, admission of their statements violated defendant's Sixth Amendment confrontation right.

D.  *Harmless Error*

■   We have held that the trial court's admission of the statements at issue here did not violate defendant's confrontation right under the Oregon Constitution but did violate his

confrontation right under the United States Constitution. Finding a federal constitutional error, however, does not end our analysis, because some classes of federal constitutional errors do not require automatic reversal of a conviction in all cases. *See Chapman v. California*, 386 US 18, 23, 87 S Ct 824, 17 L Ed 2d 705 (1967) (so stating). Rather, violations of federal constitutional rights must be analyzed under the federal harmless error test, and, if that test is satisfied, reversal may not be required. *See id.* at 21 (stating that "[w]hether a conviction for crime should stand when a State has failed to accord federal constitutionally guaranteed rights is every bit as much of a federal question as what particular federal constitutional provisions themselves mean, what they guarantee, and whether they have been denied"). "Trial errors" are subject to harmless error analysis. *Arizona v. Fulminante*, 499 US 279, 307-09, 111 S Ct 1246, 113 L Ed 2d 302 (1991). Violations of the Sixth Amendment Confrontation Clause are trial errors subject to harmless error analysis under the rule announced in *Chapman. See Harrington v. California*, 395 US 250, 253, 89 S Ct 1726, 23 L Ed 2d 284 (1969) (so stating).

A federal constitutional error is harmless, such that the conviction will be upheld, "if the reviewing court may confidently say, on the whole record, that the constitutional error was harmless beyond a reasonable doubt." *Delaware v. Van Arsdall*, 475 US 673, 681, 106 S Ct 1431, 89 L Ed 2d 674 (1986) (describing the test announced in *Chapman*). In reviewing the whole record to determine whether an error was harmless, the court should consider "the importance of the [improperly admitted] testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, * * * and, of course, the overall strength of the prosecution's case." *Id.* at 684.

Stated at the outset, the sole issue that we must consider under the above-described harmless error analysis is whether the improperly admitted evidence, when viewed in the context of all the other properly admitted evidence, uniquely established defendant's state of mind when he shot

the victims, *i.e.*, whether he acted under a reasonable belief that one of the victims was attempting to rob or kill Gregory.[7] Before trial, the police questioned defendant about the shootings, and he stated that he had seen one of the victims point a gun at Gregory and, in response, defendant fired all 30 shots from his gun into the victims. The state introduced those statements at defendant's trial. Also, defendant took the stand and admitted intentionally shooting the victims, though he claimed that he had done so in defense of Gregory. The physical evidence of the crime further established that the victims had been shot by the gun that defendant had admitted shooting. Thus, defendant's conviction turned on the issue whether he shot the victims in defense of others; consequently, that issue must be the focus of our harmless error analysis.

To counter defendant's defense-of-others claim, the prosecution, in part, relied upon the hearsay statements of Gregory and Lewis. In those statements, Gregory and Lewis both claimed that defendant previously had discussed shooting someone on several occasions, thus undermining his defense-of-others claim.

Specifically, Gregory stated that defendant "was always sayin' that he wanted to shoot somebody." Gregory further stated that one week before the murders he and defendant had been at Larch Mountain target shooting and had seen some "Mexicans" firing an automatic weapon. Upon

---

[7] ORS 161.209 provides, in part:

"A person is justified in using physical force upon another person * * * to defend a third person from what the person reasonably believes to be the use or imminent use of unlawful physical force, and the person may use a degree of force which the person reasonably believes to be necessary for the purpose."

However, the legislature has imposed limitations on the use of physical force set out in ORS 161.219:

"[A] person is not justified in using deadly physical force upon another person unless the person reasonably believes that the other person is:

"(1) Committing or attempting to commit a felony involving the use or threatened imminent use of physical force against a person; or

"* * * * *

"(3) Using or about to use unlawful deadly physical force against a person." ORS 161.219.

seeing the "Mexicans," Gregory stated that he and defendant "probably" engaged in a conversation about shooting the "Mexicans." Gregory also stated that he and defendant "probably" had discussed shooting the victims before defendant began firing at them. Finally, Gregory stated that he, defendant, and Lewis had discussed killing the victims just before they were shot and that he thought defendant had shot the victims "[j]ust to shoot somebody."

Lewis stated that Gregory and defendant had told him that, while they had been at Larch Mountain a week before the murders, some "Mexicans" arrived and began firing an automatic weapon. Lewis further stated that Gregory and defendant stated "they would have liked to shoot [the Mexicans] if they had both had [better weapons]." Lewis also stated that Gregory and defendant had told him, while they had been at Larch Mountain on the day of the murders, that, "if somebody came up there that day with the gun they wanted, that they'd probably shoot them * * *." Additionally, Lewis confirmed that Gregory and defendant had told him that, "if they [had] an opportunity on [the day of the murders] that they[ ] [were] going to shoot somebody." Eventually, Lewis admitted that he, Gregory, and defendant had discussed "killing somebody on the way up to Larch Mountain." Finally, Lewis stated that, while the victims had been checking their target, he, Gregory, and defendant "talk[ed] about shooting the guys * * *."

In addition to the foregoing statements of Gregory and Lewis, the prosecution also introduced statements by several of defendant's other acquaintances to the effect that defendant previously had discussed shooting someone on numerous separate occasions. Several of defendant's acquaintances further stated that defendant often spoke of a desire to shoot someone, and one witness testified that, after the murders, Lewis told him that Lewis, Gregory, and defendant intentionally had killed the victims.

Specifically, Crocker, defendant's friend, stated that defendant, while riding in a car with Crocker two or three weeks before the murders, took out a handgun, waved it around, and stated that "he wanted to use it to try to kill someone someday." Crocker further testified that defendant

had stated that "he wanted to use the gun to try to kill someone and get away with it * * * to reenact the movie 'Seven.' "[8] Finally, Crocker testified that defendant had stated that he had brought some combat or jungle boots that would be useful for running through the forest when "try[ing] to kill someone[.]" Those were the same boots that defendant later wore on the day of the murders.

Drinkard, Gregory's former girlfriend, testified that, two weeks before the murders, she had been riding in a car with defendant when defendant had stated, "I'm going to kill somebody[,] and I'm going to take down whoever goes with me."

Another one of defendant's friends, Cassily, testified that defendant had stated, a few months before the murders, that "he wanted to * * * see what his gun would do to somebody * * *" and that "he wanted to see what a bullet would do to human flesh." Cassily also testified that defendant commonly talked about killing people and that defendant, two or three weeks before the murders, had stated that he "want[ed] to rob people of their guns on Larch Mountain[ ]" and "get away with it."

Defendant's former roommate, McGee, testified that defendant, a week before the murders, had told McGee of a conversation that defendant had had with Gregory while defendant and Gregory had been at Larch Mountain. Defendant stated that he and Gregory had discussed shooting some "Hispanics" who were at Larch Mountain and taking an automatic weapon that the "Hispanics" were shooting. During that conversation, defendant and Gregory also discussed murdering any witnesses to the robbery so that "nobody would find out about it[.]" According to McGee, defendant stated that he and Gregory did not go through with the robbery because some additional people had showed up.

Defendant's former coworker, Galbraith, testified that defendant had stated that "he was thinking about taking out [killing] one of his friend's girlfriends[ ]" and asked

---

[8] *Seven* (New Line Cinema 1995) (film portraying crimes of a serial killer who chooses victims based upon each victim's commission of one of the seven deadly sins).

"how much he should charge to do something like that." A day later, defendant had stated that "he was thinking about [killing the girlfriend] for $400, maybe even free." Another one of defendant's former coworkers, Foht, testified that defendant had stated that "a friend of his had offered him several thousand dollars * * * to bump off somebody."

Defendant's high school friend, Karczag, testified that, one week before the murders, defendant had stated that he wanted to "becom[e] a hired assassin * * * and kill[ ] for money."

Defendant's friend Marcia Nicholas testified that defendant had made statements expressing an interest in killing people "[a]ll throughout high school." Defendant had stated that "he was curious as to what it would be like to kill somebody."

Finally, David Nicholas, another one of defendant's high school friends, testified that he and defendant were at Larch Mountain target shooting about three weeks before the murders when other people arrived to target shoot as well. Nicholas stated that the other people had made some "rude comments toward us[ ]" and that, in response, defendant "said that we could take them out [and] take their weapons[.]" Nicholas also testified that, while visiting Lewis in jail some time after the murders, he had asked Lewis about what had happened on Larch Mountain, and Lewis had told him that "we did it on purpose."[9]

The main distinction between the statements of Gregory and Lewis and the statements by the witnesses who testified at defendant's trial is that the former described the intent and plan to kill the specific victims in this case. The latter primarily helped establish that defendant had a general interest and desire to kill someone. However, Cassily testified that defendant had expressed a more specific plan to "rob people of their guns on Larch Mountain[ ]" and "get away with it." That testimony is consistent with what

---

[9] We note that defendant did not object to David Nicholas's testimony about what Lewis had told him during the jail visit. In fact, defendant's lawyer specifically asked Nicholas to further explain the context of the statement on cross-examination.

Gregory and Lewis said about defendant planning to shoot or rob someone earlier on the day of the murders. Additionally, McGee's testimony about the plan to shoot the "Hispanics" during an earlier incident on Larch Mountain and steal their automatic weapon duplicates similar statements by Gregory and Lewis. Furthermore, David Nicholas's testimony about Lewis's post-murder statement that he, Gregory, and defendant had killed the victims "on purpose[,]" corresponds with what Gregory and Lewis told the police about the murders, *i.e.*, that Gregory, Lewis, and defendant had planned to kill the victims and had not acted in self-defense. Hence, the probative value of the statements of Gregory and Lewis was diminished in comparison to the rest of the prosecution's case. The statements constituted cumulative evidence, and they were substantially corroborated by defendant's statements and several other witnesses.

Finally, the prosecution's case, even after disregarding the inadmissible statements, was strong. In comparison, defendant's defense-of-others claim was weak. Specifically, defendant did not initially assert that he had acted in defense of others. During police interrogation after the crimes, defendant repeatedly claimed that he could not remember what had happened that evening. After further questioning, defendant eventually "remembered" that one of the victims had pointed a gun at Gregory and, in response, defendant began firing. Furthermore, defendant told conflicting versions of the shooting. At first, defendant told his cousin's husband, Daniels, that he had shot one of the victims and that Gregory had shot the other. Later, defendant told the police that he had shot both of the victims.

Defendant's defense-of-others claim also was undermined by his actions after the shooting. Defendant did not report the shooting to the police but, instead, attempted to hide his weapon and otherwise cover up his involvement in the shooting.

Additionally, the physical evidence present at the scene of the shooting contradicts essential parts of defendant's defense-of-others theory. According to defendant, Gregory, Lewis, and the victims were standing between two and ten feet apart, examining their target down in a gravel

pit. At some point, defendant, who was about 60 feet away, saw one of the victims point his gun at Gregory. Defendant then began firing and fired all 30 bullets from his gun. Defendant stated that he did not remember specifically aiming at the victims or repeatedly pulling the gun's trigger. Part of defendant's case at trial suggested that either defendant had fired instinctively without aiming or that his gun had malfunctioned and began firing automatically. Defendant also claimed that he had done all the initial shooting and then ran into the woods when his gun was empty.

However, the firearms experts who testified at defendant's trial, including both defense and prosecution witnesses, agreed that, if defendant had rapidly fired his gun while Gregory, Lewis, and the victims were between two and ten feet apart, both Gregory and Lewis would have been shot. Those firearms experts also testified that, based upon the number of times that defendant had shot the victims, defendant had been consciously aiming at the victims and had not just instinctively pulled the trigger. Moreover, a disinterested witness who had been present in the vicinity of the shootings testified that he had heard several different weapons being fired simultaneously. The expert testimony, taken in conjunction with that of the disinterested witness, not only contradicts defendant's claim that he did all the initial firing and then ran into the woods when his gun was empty, but it also more generally subverts defendant's entire version of what happened. The physical evidence, which established that defendant's expenditure of 30 rounds of ammunition was not a sudden, unanticipated reaction to events but was, instead, a focused and murderous undertaking, was sufficient by itself to scuttle defendant's theory of the case.

Therefore, considering the cumulative nature of the inadmissible statements and the relative strength of the prosecution's case, we conclude, on the whole record, that the constitutional error was harmless beyond a reasonable doubt.

The decision of the Court of Appeals is affirmed. The judgment of the circuit court is affirmed. The case is remanded to the circuit court for resentencing consistently with the Court of Appeals opinion.