Argued and submitted March 7, decision of Court of Appeals affirmed June 15,
reconsideration denied August 15, 2006

## STATE OF OREGON,
*Respondent on Review,*

*v.*

## DALE RICHARD RANDANT,
*Petitioner on Review.*

(CC 98-052; CA A111296; SC S52289)

136 P3d 1113

Peter Gartlan, Chief Defender, argued the cause and filed the briefs for petitioner on review. With him on the briefs was Peter A. Ozanne, Executive Director, Office of Public Defense Services, Salem.

Kaye McDonald, Assistant Attorney General, argued the cause and filed the briefs for respondent on review. With her on the briefs were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Dale Richard Randant filed briefs *in propria persona.* With him on the briefs were Peter A. Ozanne, Executive Director, and Peter Gartlan, Chief Defender, Office of Public Defense Services, Salem.

KISTLER, J.

**KISTLER, J.**

In this criminal case, defendant repeatedly called the police over a five-month period asking to talk to them. He did so after the police had advised him that he had been indicted for aggravated murder and after his lawyer had advised him not to talk to the police. The question that this case poses is what steps the state and federal constitutions required the police to take before they could accept defendant's repeated invitations to talk with him. The trial court held that the officers had respected defendant's constitutional rights, and the Court of Appeals upheld that ruling. *State v. Randant*, 192 Or App 668, 87 P3d 688, *adhered to on recons*, 196 Or App 601, 103 P3d 1134 (2004). For the reasons set out below, we affirm the Court of Appeals decision.

Defendant worked for Saffa and Alaa Nasser at their automobile body shop. The Nassers suspected that defendant had been taking money from their business. One day, defendant and Saffa left the business together. Only defendant returned. Eight days later, the police found Saffa's body on Parrett Mountain. He had been shot, and his body had been hidden several feet off the road in some underbrush.

Two days after law enforcement officers from Oregon discovered Saffa's body, police officers in Olympia, Washington, arrested defendant on an unrelated charge. Detective O'Connell went to Olympia to talk to defendant about Saffa's death. After O'Connell advised defendant of his *Miranda* rights, defendant invoked his right to counsel and O'Connell terminated the interview.

On December 22, 1997, the State of Oregon indicted defendant for multiple counts of aggravated murder arising out of Saffa's death, kidnapping, and being a felon in possession of a firearm. Approximately four months later, on April 21, 1998, defendant called O'Connell from the jail in Olympia where he still was being held. When O'Connell answered the telephone, he acknowledged that defendant had called "several times * * * a couple of Fridays ago," but explained that he had not been able to call defendant back. O'Connell then asked defendant what was on his mind, and defendant said,

"I wanna know, uh, if you guys checked anything out any further and uh, when you're gonna talk to me, and uh, when I'll be going there?" O'Connell reminded defendant that he previously had invoked his right to counsel and that O'Connell could not speak with him about Saffa's death. O'Connell noted that "it appears you've changed your mind on that issue," and defendant replied, "I could talk about some things."

Before speaking further with defendant, O'Connell advised him that he had been indicted for aggravated murder.[1] During the remainder of the call, defendant acknowledged that he had been involved in Saffa's death but stated that it was not a murder. He suggested, without disclosing any details, that another person also had been involved. He asked if the police had checked for fingerprints on the murder weapon and said that he had been "thinking you guys would come up here and we were gonna talk about [the investigation]."

Defendant called O'Connell a second time on June 8, 1998. He wanted to know why O'Connell had not come up to Olympia to talk to him. During that conversation, defendant said that his lawyer[2] had told him "not to talk to you." As defendant explained, he had directed his lawyer, "[G]o feel 'em out, you know. Tell the prosecutor or whoever * * * [t]hat I want to talk to 'em. [The lawyer] said * * * no, no you don't talk to 'em, this an[d] that." O'Connell replied, "You do, you know, do what you thin[k] best. I, I am doing my best to try and get up there."

Defendant then briefly sketched out for O'Connell what had occurred the day of Saffa's death. He said that he, his girlfriend, and Saffa had driven to Parrett Mountain to look at some property that defendant was thinking about buying. While they were on Parrett Mountain, defendant and Saffa got into a struggle over the business. The girlfriend

---

[1] When advised of that fact, defendant asked, "Is that bad, bad, bad?" O'Connell replied, "Yeah, I won't, I won't sugar coat it, that's bad."

[2] On June 9, 1998, the trial court appointed a lawyer for defendant on the charges arising out of Saffa's death. Because this conversation occurred a day earlier, defendant presumably was referring to the lawyer appointed to represent him on the unrelated charges in Washington.

took a gun out of the van to try to get their attention. When defendant tried to take the gun away from her, it discharged accidentally hitting and killing Saffa.

Defendant explained that he had called O'Connell because he was concerned that his girlfriend was changing her story, either under the influence of Saffa's brother Alaa or to avoid her own responsibility for Saffa's death. Defendant wanted O'Connell to understand the "true facts," asked O'Connell to arrange a polygraph test so that defendant could prove his innocence, and wanted O'Connell to tape record his conversations with his girlfriend to prove that she had been there when Saffa died.

The day after that telephone call, on June 9, 1998, the trial court appointed a lawyer to represent defendant on the charges arising out of Saffa's death. The lawyer wrote a letter to the district attorney stating that he invoked "defendant's constitutional rights, expressly, but not limited to his right to remain silent. I wish to be present during any questioning, or attempted questioning by any law enforcement officials."

On June 25, defendant called O'Connell a third time. He told O'Connell that he had a lawyer and that the lawyer "didn't want me to talk to you." O'Connell replied that, "[W]ell you, you do, you know, what you think, uhm, you should do." O'Connell explained that he was not going to "comment on [defendant's decision] either way." Defendant then returned to his familiar themes of wanting the officers to arrange a polygraph examination for him, his concerns that his girlfriend was now lying to avoid responsibility, and his efforts to persuade O'Connell that he was innocent.

Defendant spoke with the police officers four more times. Two of those discussions are relevant to the claims that he raises on review.[3] The police brought defendant to Oregon on June 29.[4] Later that day, another officer, Boothby,

[3] The first of the other two discussions was a September 14, 1998, telephone call to O'Connell, in which defendant asked about the status of investigative leads that he wanted O'Connell to pursue. The second discussion was a December 14, 1998, telephone call to O'Connell, which the state did not offer at trial.

[4] The State of Oregon held defendant in custody until his trial on the aggravated murder and other charges arising out of Saffa's death.

interviewed defendant at defendant's request. Before talking with defendant, Boothby advised him of his *Miranda* rights. Defendant said that he had told his lawyer to come to the interview but noted that the lawyer had not done so. When Boothby asked if defendant wanted to wait until his lawyer got there, defendant declined. After noting that the trial court had appointed counsel for defendant, Boothby said, "And he's advised you not to talk about the case, correct?" Boothby then added that he understood that defendant had wanted "to talk about some certain issues." As Boothby was trying to clarify that point, defendant interjected that he knew, "I do not have to talk to you. I've been calling you guys for months asking to talk to you." Defendant then proceeded to tell Boothby about the events leading to Saffa's death.

Approximately a month and a half later, on August 11, 1998, O'Connell spoke with defendant in person, again at defendant's request. O'Connell readvised defendant of his *Miranda* rights, noted that defendant's lawyer had advised defendant not to speak with the police, noted that defendant's lawyer had written to the district attorney invoking defendant's rights, and observed finally that defendant had asked to speak with him. Having considered that information, defendant reaffirmed that he wanted to speak with O'Connell and discussed, in great detail, the events that had resulted in Saffa's death. In the August 11, 1998, interview, defendant both repeated and expanded on the information that he had told O'Connell and Boothby earlier.

Defendant's efforts to convince the officers that he was not responsible for murdering Saffa proved unsuccessful. The state continued to pursue the prosecution, and defendant filed a pretrial motion to suppress the statements that he had made to O'Connell and Boothby. The trial court denied the motion. During trial, the state introduced evidence from six of those discussions.[5] The jury found defendant guilty of multiple counts of aggravated murder, murder, kidnapping, and being a felon in possession of a firearm. At

---

[5] The state introduced the transcripts of the telephone conversations on April 21, 1998; June 8, 1998; June 25, 1998; and September 14, 1998. It also introduced the transcript of O'Connell's August 11, 1998, interview with defendant. Finally, the state called Boothby, who testified concerning his June 29, 1998, interview with defendant.

sentencing, the jury declined to impose the death penalty but found that defendant should serve a life sentence without the possibility of parole. The trial court entered judgment accordingly.

■  On appeal, the Court of Appeals accepted the state's concession that the trial court had erred in failing to merge some of the convictions and remanded the case for the trial court to enter a corrected sentence. *Randant*, 192 Or App at 669. The Court of Appeals, however, affirmed the remainder of the trial court's rulings. *Id.* Defendant has petitioned for review of those rulings. We allowed review to consider only one issue—whether O'Connell and Boothby's interviews with defendant violated his state or federal constitutional right to counsel.[6] We begin with defendant's state constitutional claims. *See Sterling v. Cupp*, 290 Or 611, 614, 625 P2d 123 (1981) (stating ordinary sequence of analysis).

■  The right to counsel derives from two separate provisions in the Oregon Constitution—Article I, section 11, and Article I, section 12. The right to counsel recognized by Article I, section 12, is an adjunct to a defendant's state constitutional *Miranda* right. *See State v. Haynes*, 288 Or 59, 71, 602 P2d 272 (1979) (describing Article I, section 12, right to counsel as a "derivative right" to protect against involuntary confessions). It attaches when a defendant is either in custody or compelling circumstance and only then if the defendant invokes the right. *See State v. Roble-Baker*, 340 Or 631, 136 P3d 22 (2006) (explaining when Article I, section 12, rights attach); *State v. Sparklin*, 296 Or 85, 89, 672 P2d 1182 (1983) (defendant's request for counsel at arraignment did not constitute invocation of right to counsel under Article I, section 12). In contrast, Article I, section 11, of the Oregon Constitution focuses on a defendant's rights during a criminal prosecution and provides that, in such a prosecution, a defendant "shall have the right * * * to be heard by * * * counsel." That right attaches when the state indicts a defendant and does so "independently of any invocation of that right by [the] defendant * * *." *Sparklin*, 296 Or at 92.

---

[6] Defendant has filed a *pro se* supplemental brief raising additional issues. We decline to consider those issues and limit our review of the Court of Appeals decision to the issue stated above.

In his brief on the merits, defendant does not contend that the police violated his right to counsel under Article I, section 12. Rather, he relies solely on his right to counsel under Article I, section 11. He contends that, under *Sparklin,* his Article I, section 11, right to counsel attached when the state indicted him for aggravated murder. All of defendant's discussions with O'Connell and Boothby occurred after that date, and defendant argues that those discussions violated Article I, section 11, for one of three reasons. First, he argues that he could not waive his Article I, section 11, right to counsel without his counsel's presence or at least advance notice to his counsel. Second, he contends that any waiver of that right must satisfy the standard set out in *State v. Meyrick,* 313 Or 125, 831 P2d 666 (1992), or at least be preceded by *Miranda* warnings. Finally, he argues that, on the facts of this case, O'Connell interfered with his right to counsel.

We begin with defendant's argument that either his counsel's presence or advance notice was necessary before he could waive his Article I, section 11, right to counsel. Commenting on that right, this court explained in *Sparklin:*

> "[O]nce a person is charged with a crime[,] he or she is entitled to the benefit of an attorney's presence, advice and expertise in any situation where the state may glean involuntary and incriminating evidence or statements for use in the prosecution of its case against defendant. This is so whether or not [a] defendant specifically requests an attorney's presence at the interrogation."

296 Or at 93. Ordinarily, "there can be no interrogation of a defendant concerning the events surrounding the crime charged unless the attorney representing the defendant on that charge is notified and afforded a reasonable opportunity to attend." *Id. Sparklin* made clear, however, that a defendant always may choose to volunteer statements as long as he or she does so "on his [or her] own initiative and not in response to questioning." *Id.*

The court did not have occasion in *Sparklin* to consider what procedures police officers must follow when a defendant initiates a conversation with them after the right to counsel has attached. Four years later, however, the court addressed that issue in *State v. Foster,* 303 Or 518, 530, 739

P2d 1032 (1987). In *Foster*, the state had indicted the defendant, and the trial court had appointed counsel to represent him. *Id.* at 522. The defendant asked through an intermediary to speak with the police, who complied with his request. *Id.* After the officers advised the defendant of his *Miranda* rights, he spoke with them and, during the interview, admitted involvement in the charged crime. *Id.*

The court held that the defendant validly had waived his Article I, section 11, right to counsel and chosen to speak with the police. *Id.* at 530. The court reasoned:

> "In prohibiting police interrogation of a defendant after the appointment or retention of counsel, this court was careful in *Sparklin* to note that '[a] defendant may, of course, volunteer statements, but this must be on his own initiative and not in response to questioning.' 296 Or at 93. In support of this proposition, the court cited *State v. Beaver*, 248 Or 101, 432 P2d 509 (1967), wherein the defendant, after appointment of counsel, initiated contact with the police and confessed. The same form of initiation occurred here when, according to the trial court's findings, defendant asked [a friend] to contact the police so that he could give a full statement of his involvement in the crime."

*Id.* Noting that the defendant had "decided to speak with the police without any request on the part of the police," the court found that the resulting police interview had complied with the defendant's Article I, section 11, right to counsel. *Id.* at 530-31.

The court's decision in *Foster* answers defendant's argument that O'Connell and Boothby could not talk with him unless his counsel was present or unless they had advised his counsel that they were going to speak with him. *Foster* makes clear that neither counsel's presence nor advance notice is necessary when a defendant voluntarily chooses to speak with the police. In this case, defendant contacted the police on each occasion and initiated conversations with them.[7] Because defendant sought to speak with O'Connell and Boothby without any request on their part, we

---

[7] Indeed, defendant often expressed frustration because the police officers had not called him back or come to talk with him; as he told the officers, "I've been calling you guys for months asking to talk to you."

conclude that, under *Foster*, they did not need to notify his counsel before accepting his invitation. *See id.* (recognizing proposition).

■ Defendant advances a second argument. He contends that, before the officers could speak with him, they needed to go through the sort of colloquy that this court required in *Meyrick* to ensure a knowing waiver of the Article I, section 11, right to counsel. Defendant's reliance on *Meyrick* is misplaced. The issue in that case was the level of knowledge necessary before a defendant could forego representation by counsel at trial and appear *pro se*. *See Meyrick*, 313 Or at 130 (stating issue). The court held that a defendant contemplating self-representation should know, in addition to his right to counsel, of the risks of proceeding at trial without a lawyer. *Id.* at 133. The court explained that a "colloquy on the record between the court and the defendant wherein the court, in some fashion, explains the risks of self-representation is the preferred means" of communicating that information. *Id.*

In this case, defendant did not seek to waive his right to counsel and represent himself at trial. It follows that the sort of colloquy that the court required in *Meyrick* was not necessary for defendant to make a voluntary and intelligent waiver of his rights in this situation. Rather, as the decision in *Foster* makes clear, when a defendant voluntarily initiates contact with the police after counsel has been appointed, knowledge of the *Miranda* rights is sufficient to ensure that the defendant's waiver of his or her Article I, section 11, right is a knowing one. *See Foster*, 303 Or at 530-31 (holding that procedures used in that case complied with Article I, section 11).

■ Applying that standard, we note that, as defendant argues, O'Connell did not readvise defendant of his *Miranda* rights before talking with him on the telephone on April 21, June 8, and June 25. The state responds that there is evidence in the record from which the trial court could have found that defendant was aware of his *Miranda* rights. Not only did O'Connell and defendant discuss some of the *Miranda* rights during their first telephone conversation, but

defendant told O'Connell during their second and third conversations that his lawyer had told him not to talk with the police—a fact from which the trial court could infer that defendant was aware of the rights that he was relinquishing by talking with O'Connell. *See Meyrick*, 313 Or at 132 ("[i]n determining whether a defendant's waiver of counsel was the intentional relinquishment or abandonment of a known right, the trial court should focus on what *the defendant* knows and understands") (emphasis in original).

We need not decide whether the references to *Miranda* during the first three telephone calls were sufficient to ensure that defendant knew all the rights that he was giving up when he called O'Connell. As explained below, any error in admitting evidence from those calls was harmless. On June 29, 1998, Boothby readvised defendant of his *Miranda* rights before talking with him, and O'Connell readvised defendant of those same rights before he spoke with him on August 11, 1998. Both officers also noted, as defendant had told them on several occasions, that defendant's counsel had advised him not to talk to them. Defendant's decision to waive his right to counsel on those two occasions clearly met the standard stated in *Foster*. Even if the earlier waivers were insufficient, a question on which we express no opinion, we conclude that any error in admitting the transcripts of those three conversations at trial was not likely to have affected the jury's verdict and thus was harmless. *See State v. Davis*, 336 Or 19, 32, 77 P3d 1111 (2003) (stating state harmless error standard). In each of those initial conversations, defendant only sketched out the information that he later told Boothby and O'Connell in far greater detail on July 29 and August 11.[8]

■  Defendant advances a final argument under Article I, section 11. He contends, even if he initiated the discussions with O'Connell, O'Connell impermissibly interfered during the course of those discussions with his right to counsel. Defendant argues that O'Connell discussed certain issues with defendant, such as taking a polygraph or tape recording

---

[8] Similarly, we need not decide whether O'Connell was required to readvise defendant of his *Miranda* rights before accepting his September 14, 1998, telephone call. Even if he were, any error was harmless.

defendant's conversation with his girlfriend, that should be the subject of lawyer-client communications. He also contends that O'Connell undermined the lawyer-client relationship by questioning defendant's lawyer's decisions. One difficulty with defendant's argument is that defendant was the person who raised the issues that he now contends O'Connell should not have discussed. Moreover, having examined the transcripts of the interviews, we agree with the trial court that O'Connell acted professionally throughout his conversations with defendant. In many instances, O'Connell clarified defendant's misunderstandings, reminding him, for example, that defendant could not talk "off the record" and that what defendant said could be used against him.

■    Defendant also argues that the officers violated his Sixth Amendment right to counsel. Before analyzing defendant's argument, we briefly review the United States Supreme Court's cases discussing the scope of the Sixth Amendment right to counsel and the terms on which a defendant may waive it. A majority of the Court held in *Massiah v. United States*, 377 US 201, 205-06, 84 S Ct 1199, 13 L Ed 2d 246 (1964), what a plurality of the Court would have held five years earlier in *Spano v. New York*, 360 US 315, 79 S Ct 1202, 12 L Ed 2d 1265 (1959): Once the Sixth Amendment right to counsel attaches, the state may deal with a defendant only through his or her counsel unless the defendant waives that right. In *Massiah*, a police informant elicited information from the defendant after indictment and appointment of counsel. The Court explained that the right to counsel's assistance guaranteed by the Sixth Amendment applies to "indirect and surreptitious interrogations as well as those conducted in the jailhouse." 377 US at 206 (internal quotations omitted). The Court accordingly held that the evidence that the informant covertly had obtained should be suppressed. *Id.* at 206-07.[9]

---

[9] In two later cases, the Court explored the boundaries of *Massiah*. The first case held that the police "deliberately elicited" information from a represented defendant when they placed a jailhouse informant in the defendant's cell, who then engaged the defendant in conversations about his crimes. *United States v. Henry*, 447 US 264, 270-75, 100 S Ct 2183, 65 L Ed 2d 115 (1980). In the second case, the police used an informant to obtain evidence from a represented defendant regarding the defendant's plan to kill a witness. *Maine v. Moulton*, 474 US 159, 164-65, 106 S Ct 477, 88 L Ed 2d 481 (1985). Although gaining information about an

Because the defendant in *Massiah* did not know that he was speaking to a government informant, that case did not require the Court to decide whether the defendant had waived his Sixth Amendment right to counsel. *See United States v. Henry*, 447 US 264, 273, 100 S Ct 2183, 65 L Ed 2d 115 (1980) (stating that "the concept of a knowing and voluntary waiver of Sixth Amendment rights does not apply in the context of communications with an undisclosed undercover informant acting for the Government"). The Court, however, has addressed that issue in two cases that bear on the resolution of this case.

In *Brewer v. Williams*, 430 US 387, 401, 97 S Ct 1232, 51 L Ed 2d 424 (1977), the Court held that the evidence in that case failed to establish that a former mental patient intentionally had relinquished his right to counsel in response to police interrogation.[10] In reaching that conclusion, the Court was careful to make clear that it was not holding "that under the circumstances of this case [the defendant] *could not*, without notice to counsel, have waived his rights under the Sixth and Fourteenth Amendments." *Id.* at 405-06 (emphasis in original). As Justice Powell observed in a concurring opinion, "the opinion of the Court is explicitly clear that the right to assistance of counsel may be waived, after it has attached, without notice to or consultation with counsel." *Id.* at 413 (concurring opinion).

Having recognized in *Brewer* that prior notice to or consultation with counsel is not necessary before a represented defendant may waive his or her Sixth Amendment right to counsel, the Court considered what steps the police must take to ensure a valid waiver of a defendant's Sixth

---

uncharged crime (killing the witness) did not violate the defendant's Sixth Amendment right to counsel, the police were aware that the informant and the defendant also would talk about the charged crime. *Id.* Reasoning that a "knowing exploitation by the State of an opportunity to confront the accused without counsel being present" violated the Sixth Amendment right to counsel, the Court held that the defendant's statements concerning the charged crime should have been suppressed. *Id.* at 176.

[10] In *Brewer*, the police officers had told the defendant's lawyer that they would not interrogate him while they were transporting him to a different location. 430 US at 392. They knew that the defendant "was a former mental patient, and knew also that he was deeply religious." *Id.* During the transport, they used psychological means to induce the defendant to confess. *Id.* at 392-93.

Amendment rights in *Patterson v. Illinois*, 487 US 285, 108 S Ct 2389, 101 L Ed 2d 261 (1988). In that case, the state had indicted the defendant for murder, and he asked an officer if anyone else had been indicted. *Id.* at 288. On learning that the state had not indicted another person, defendant asked, " '[W]hy wasn't he indicted, he did everything.' " *Id.* The defendant then mentioned a witness to the murder, and the officer interrupted him to advise him of his *Miranda* rights. *Id.* Having waived his *Miranda* rights, the defendant spoke at length about the murder. *Id.*

The Court held that, even though the Sixth Amendment right to counsel had attached, the *Miranda* warnings that the officer provided were sufficient to ensure that the defendant's waiver of that right was knowing. The Court reasoned:

"[W]e have taken a more pragmatic approach to the waiver question—asking what purposes a lawyer can serve at the particular stage of the proceedings in question, and what assistance he could provide to an accused at that stage—to determine the scope of the Sixth Amendment right to counsel, and the type of warnings and procedures that should be required before a waiver of that right will be recognized."

*Id.* at 298. The Court noted that, at one end of the spectrum, it had concluded that there is no Sixth Amendment right to counsel at a postindictment photographic display identification. *Id.* At the other end of the spectrum, "recognizing the enormous importance and role that an attorney plays at a criminal trial, [the Court has] imposed the most rigorous restrictions on the information that must be conveyed to a defendant * * * before permitting him to waive his right to counsel at trial." *Id.* The Court concluded:

"Applying this [pragmatic] approach, it is our view that whatever warnings suffice for *Miranda*'s purposes will also be sufficient in the context of postindictment questioning. The State's decision to take an additional step and commence formal adversarial proceedings against the accused does not substantially increase the value of counsel to the accused at questioning, or expand the limited purpose that an attorney serves when the accused is questioned by authorities. With respect to this inquiry, we do not discern

a substantial difference between the usefulness of a lawyer to a suspect during custodial interrogation, and his value to an accused at a postindictment questioning."

*Id.* at 298-99 (footnote omitted).[11]

The Court was careful to make clear that the issue in *Patterson* arose after indictment but before the defendant had requested counsel at arraignment and before counsel had been appointed. It noted that, once a defendant requests counsel at arraignment or counsel is appointed, "a distinct set of constitutional safeguards aimed at preserving the sanctity of the attorney-client relationship takes effect." *Id.* at 290 n 3. In those two situations, the Sixth Amendment right to counsel prohibits police from initiating a conversation with the defendant that leads to waiver. *See Michigan v. Jackson,* 475 US 625, 636, 106 S Ct 1404, 89 L Ed 2d 631 (1986); *Maine v. Moulton,* 474 US 159, 176, 106 S Ct 477, 88 L Ed 2d 481 (1985) (so holding). Only if the defendant initiates that conversation can the waiver be valid. *See Jackson,* 475 US at 634-36 (recognizing proposition).[12]

With that background in mind, we turn to the six discussions between defendant and the police that the state introduced at trial. The first two discussions occurred after the state had indicted defendant but before the trial court had appointed counsel to represent him on the charges arising out of Saffa's death. Under *Patterson,* defendant's waiver

---

[11] The Court added in a footnote that it "has recognized that the waiver inquiry focuses more on the lawyer's role during such questioning, rather than the particular constitutional guarantee that gives rise to the right to counsel at that proceeding." *Patterson,* 487 US at 299 n 12. It concluded that "it should be no surprise that we now find a strong similarity between the level of knowledge a defendant must have to waive his Fifth Amendment right to counsel, and the protection accorded to Sixth Amendment rights." *Id.*

[12] In *Jackson,* the Court held as a matter of the Sixth Amendment that, "if police initiate interrogation after a defendant's assertion, at an arraignment or similar proceeding, of his right to counsel, any waiver of the defendant's [Sixth Amendment] right to counsel for that police-initiated interrogation is invalid." 475 US at 636. The Court explicitly borrowed the Fifth Amendment rule from *Edwards v. Arizona,* 451 US 477, 101 S Ct 1880, 68 L Ed 2d 378 (1981), and found that that rule applies equally to the Sixth Amendment right to counsel. *Jackson,* 475 US at 634-35. Similarly, in *Moulton,* the Court recognized that, once counsel is appointed, a defendant may rely on counsel to serve as a "medium between him and the State." 474 US at 176.

of his Sixth Amendment right to counsel will be valid if defendant was aware of his *Miranda* rights. The last four discussions occurred after indictment and after counsel had been appointed to represent defendant on the charged crimes. *Patterson* teaches that, in that situation, defendant's waiver will be valid only if he initiated the conversation that led to the waiver and if he was aware of his *Miranda* rights.

As explained above, defendant initiated each of the discussions with the officers. He also received *Miranda* warnings before his June 29 discussion with Boothby and his August 11 discussion with O'Connell. As also explained above, we need not decide whether defendant was aware of his *Miranda* rights on the other four occasions. Even if he were not, any error in admitting the transcripts of those conversations was harmless in light of the evidence concerning the June 29 and August 11 interviews. *See Harrington v. California*, 395 US 250, 254, 89 S Ct 1726, 23 L Ed 2d 284 (1969) (even if two confessions should not have been admitted, any error was harmless because evidence was cumulative); *State v. Cook*, 340 Or 530, 544, 135 P3d 260 (2006) (stating federal harmless error standard). In those two discussions, defendant repeated at great length everything that he had mentioned on the other occasions to O'Connell. The trial court did not commit reversible error in denying defendant's motion to suppress his statements.

The decision of the Court of Appeals is affirmed.