Argued and submitted April 28, affirmed October 11, 2006

STATE OF OREGON,
*Respondent,*

*v.*

MIGUEL ESPINOZA CAMARENA,
aka Miguel Camarenaespinoza,
*Appellant.*

0303-31454; A122282

145 P3d 267

Susan F. Drake, Senior Deputy Public Defender, argued the cause for appellant. With her on the brief were Peter A. Ozanne, Executive Director, and Peter Gartlan, Chief Defender, Office of Public Defense Services.

Janet A. Metcalf, Assistant Attorney General, argued the cause for respondent. With her on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Before Haselton, Presiding Judge, and Armstrong and Rosenblum,* Judges.

HASELTON, P. J.

---

* Rosenblum, J., *vice* Richardson, S. J.

## HASELTON, P. J.

Defendant appeals from a judgment of conviction for felony fourth-degree assault. ORS 163.160.[1] He assigns error to the trial court's admission into evidence of various out-of-court statements by the complainant, including her statements in a recorded conversation with a 9-1-1 operator and her subsequent statements to investigating police officers. Defendant asserts that, because the complainant was unavailable, the admission of those statements violated his confrontation rights under both the Oregon and United States constitutions. Or Const, Art I, § 11; US Const, Amend VI. Applying *Crawford v. Washington*, 541 US 36, 124 S Ct 1354, 158 L Ed 2d 177 (2004), as amplified in *Davis v. Washington*, ___ US ___ , 126 S Ct 2266, 165 L Ed 2d 224 (2006), we conclude that the trial court did not err in admitting certain of the complainant's statements and that any error in admitting the other statements was harmless. We also reject without discussion defendant's assignment of error regarding the denial of a motion for judgment of acquittal. Accordingly, we affirm.

Defendant's conviction arises from an incident in which he allegedly struck his former girlfriend, Carder, in the eye during an argument in their apartment. After the alleged assault, Carder told defendant that she was going to call the police, and defendant immediately left the residence.

Carder called 9-1-1 about one minute after the alleged assault but hung up before speaking. The 9-1-1 operator called Carder back, and Carder told the 9-1-1 operator

---

[1] ORS 163.160 provides, in part:

"(1) A person commits the crime of assault in the fourth degree if the person:

"(a) Intentionally, knowingly or recklessly causes physical injury to another[.]

"* * * * *

"(2) Assault in the fourth degree is a Class A misdemeanor.

"(3) Notwithstanding subsection (2) of this section, assault in the fourth degree is a Class C felony if the person commits the crime of assault in the fourth degree and:

"(a) The person has previously been convicted of assaulting the same victim[.]"

about the assault; her statements are recounted in detail below. *See* 208 Or App at 579. The operator sent a police officer, Rema Teeny, to the couple's apartment. When Teeny arrived, five to ten minutes after the couple's argument ended, Carder reiterated her account. Teeny took photographs of Carder's eye.

About five days later, a detective with the domestic violence unit, William Sanders, made a follow-up visit to Carder. Carder confirmed that defendant had hit her in the eye. At that point, Sanders could still see some slight swelling and redness.

Carder failed to appear on the day of trial. In place of her testimony, the state sought to introduce the recording of the 9-1-1 call and the officers' testimony recounting Carder's subsequent statements. Before trial, relying on the confrontation provisions of the United States and Oregon constitutions, defendant moved, unsuccessfully, to exclude that evidence. The trial court admitted Carder's statements as "excited utterances" under OEC 803(2):

"On the issue related to whether I will receive the statement[s] of the victim, the answer is that I will. I'm satisfied that they fall within the hearsay exception for excited utterance. * * *

"* * * She appeared to have been crying. Her voice was quivering. * * * Her demeanor throughout her encounter * * * was consistently that of a person who was reacting to having been physically mistreated.

"* * * And her statement on the 9-1-1 tape not only corroborates the observations of the officer as to her emotional state, but is independently clearly a statement made under the influence of an exciting event, and so it will be received[.]"[2]

At trial, the state played the 9-1-1 recording to the jury.[3] The recording shows that Carder initially called and

---

[2] Further, and without amplification, the court rejected defendant's constitutional arguments.

[3] The court reporter did not transcribe the contents of the 9-1-1 call; consequently, the trial transcript does not contain a transcript of what was played to the jury. However, we granted defendant's motion to supplement the record with an audio recording of the trial.

hung up. However, the 9-1-1 operator immediately called back and spoke with her:

"CARDER: Hello.

"9-1-1: Hi, this is 9-1-1. Somebody called and hung up. Is there a problem there?

"CARDER: Yeah, my boyfriend hit me but then he left.

"9-1-1: Where is he at now?

"CARDER: I don't know. He took the car and he left."

After that initial exchange, the operator learned Carder's address and obtained a description of the car. The operator then attempted to learn whether Carder was experiencing a medical emergency:

"9-1-1: Do you need medical attention?

"(no response)

"9-1-1: Where did he hit you at?

"CARDER: In my eye.

"9-1-1: Do you need medical to look at it?

"CARDER: (inaudible) black and blue. No. I have a black eye right now though."

Carder then gave the operator more information, including defendant's name and driver's license number, and stated that defendant was on probation for "family violence." Carder also told the operator that the assault occurred "[l]ike a minute" before she called 9-1-1, and she began to describe the circumstances of the assault (*viz.*, that she and defendant were arguing when she left to answer the ringing phone), but did not finish. Throughout the recording, and especially at the beginning, Carder was crying and her voice was agitated.

The state called Teeny and Sanders to testify concerning Carder's statements after the incident. Teeny testified that, when she arrived at the apartment five to ten minutes after the incident, Carder appeared frightened and upset and had a red swollen injury over her left eye. Carder told Teeny that the injury to her eye came from being hit by defendant.

Sanders testified that he had contacted Carder about five days after the incident. According to Sanders, Carder reiterated that defendant had hit her and showed him where she had been hit. Sanders testified that he could see slight discoloration and swelling on the injured area.

Defendant testified on his own behalf. He stated that Carder is his girlfriend, that the two of them live together, and that they have two children together. Defendant admitted to having previously pleaded guilty to assaulting Carder, but he emphasized that he had taken anger management classes and, consequently, would not ever have assaulted her again. Defendant's description of the circumstances that culminated in the 9-1-1 call tracked Carder's statements to the police—up to the point of the alleged assault. According to defendant, the phone rang in the middle of an argument the couple was having and, when Carder went to answer the phone, he became angry. As Carder answered the phone, defendant attempted to "pull[ ] the phone" from her hand, but she pulled back. At that point, Carder threatened to call the police, and defendant left the house.

Defendant offered no explanation for Carder's injuries. Instead, he claimed that Carder was never actually injured and that reports of redness and swelling around her eye were inaccurate. Defendant testified that he saw Carder within 24 hours of the alleged assault and that he did not notice any injury at that time. In addition, defendant examined the photographs that Teeny had taken and testified that, in his opinion, nothing about Carder's eye looked out of the ordinary.

■ The jury found defendant guilty, and the trial court entered judgment. Defendant appeals, renewing his arguments that, because Carder was unavailable at trial, the admission of the 9-1-1 tape and of the police officers' testimony recounting her statements violated the confrontation provisions of Article I, section 11,[4] and the Sixth Amendment.[5] We begin by analyzing the statements contained in

---

[4] Article I, section 11, provides, in part: "In all criminal prosecutions, the accused shall have the right * * * to meet the witnesses face to face[.]"

[5] The Sixth Amendment provides, in part: "In all criminal prosecutions, the accused shall enjoy the right * * * to be confronted with the witnesses against him[.]"

the 9-1-1 recording because, as explained more fully below, if certain of those statements were admissible, admitting the remaining statements (the balance of the 9-1-1 tape and Carder's statements as recounted by Teeny and Sanders) was, at worst, harmless error.

■■ In determining whether an out-of-court statement violates a defendant's confrontation rights under Article I, section 11, Oregon courts

> "rel[y] upon the test announced by the United States Supreme Court in [*Ohio v.*] *Roberts*, 448 US 56[, 100 S Ct 2531, 65 L Ed 2d 597 (1980)]. *State v. Campbell*, 299 Or 633, 648, 705 P2d 694 (1985). * * * [T]he *Roberts* test contains two requirements. First, the declarant must be unavailable, and, second, the declarant's statement must have 'adequate indicia of reliability.' *Id.* (quoting *Roberts*, 448 US at 66). A statement is considered reliable when it falls within a 'firmly rooted hearsay exception' or when it is accompanied by 'particularized guarantees of trustworthiness.' [*State v.*] *Nielsen*, 316 Or [611, 623, 853 P2d 256 (1993)] (quoting *Roberts*, 448 US at 65-66).
>
> "Although the United States Supreme Court no longer adheres to the *Roberts* test in the context of the Sixth Amendment Confrontation Clause, we continue to use it to analyze Confrontation Clause claims under Article I, section 11, of the Oregon Constitution[.]"

*State v. Cook*, 340 Or 530, 540, 135 P3d 260 (2006).

Under that test, defendant's Article I, section 11, challenge to the admission of the 9-1-1 recording fails. It is undisputed that Carder was unavailable to testify. The statements contained on the 9-1-1 recording were admitted pursuant to OEC 803(2), the "excited utterance" hearsay exception. *See* 208 Or App at 578. On appeal, defendant does not contend that the trial court's application of OEC 803(2) was somehow incorrect. Accordingly, under *Roberts*, the reliability of Carder's statements to the 9-1-1 operator is established by the fact that they were admitted under a "firmly rooted" hearsay exception. *See White v. Illinois*, 502 US 346, 355 n 8, 112 S Ct 736, 116 L Ed 2d 848 (1992) (holding that the "excited utterance" exception is firmly rooted).

■    Our consideration of defendant's challenge under the Sixth Amendment is, necessarily, much more extensive and nuanced. *Crawford,* and the Court's decision last term in *Davis,* frame our analysis. Under *Crawford,* the Confrontation Clause of the Sixth Amendment prohibits the "admission of testimonial statements of a witness who did not appear at trial unless [the witness] was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." 541 US at 53-54. It is undisputed, here, that Carder was unavailable to testify and that defendant never had an opportunity for cross-examination. Consequently, if Carder's statements are testimonial statements, it was error to admit them.

In *Crawford,* the Court did not purport to offer a precise definition of testimonial statements. However, it did identify some examples, including (as in that case) statements given in response to police interrogation:

"An accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not. The constitutional text, like the history underlying the common-law right of confrontation, thus reflects an especially acute concern with a specific type of out-of-court statement.

"Various formulations of this core class of 'testimonial' statements exist: '*ex parte* in-court testimony or its functional equivalent—that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially'; 'extrajudicial statements * * * contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions'; 'statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial[.]' These formulations all share a common nucleus and then define the Clause's coverage at various levels of abstraction around it. Regardless of the precise articulation, some statements qualify under any definition—for example, *ex parte* testimony at a preliminary hearing.

"Statements taken by police officers in the course of interrogations are also testimonial under even a narrow standard."

*Id.* at 51-52 (citations omitted; ellipsis in original).

In *Davis*, the Court amplified and refined the meaning of testimonial statements in the particular context of 9-1-1 telephone calls and "domestic disturbance" contacts by police officers.[6] In *Davis*, the victim in a domestic abuse situation called 9-1-1. When the 9-1-1 operator asked about the problem, the victim responded, "He's here jumpin' on me again." When the operator asked if the attacker had a weapon, the victim responded, "No. He's usin' his fists." The operator asked the victim basic questions about the incident, including the name of the defendant. During that conversation, the defendant was still in the house, but before the conversation ended, the victim reported that the defendant was leaving. After the defendant left, the operator gathered more information about the incident and about the defendant. ____ US at ____ , 126 S Ct at 2271.

The Court limited its review to the issue of whether admission of the victim's statements identifying the defendant as her attacker violated the Confrontation Clause. The Court began by qualifying its seemingly unqualified statement in *Crawford* that "[s]tatements taken by police officers in the course of interrogations" are testimonial "under any definition." *Crawford*, 541 US at 52. Rather, the Court explained, that statement referred to the circumstances in *Crawford*, where the declarant responded to police questions while she was in custody and after having been given *Miranda* warnings. *Davis*, ____ US at ____ , 126 S Ct at 2273. The Court then propounded the following distinction between nontestimonial and testimonial statements made in response to police interrogation:

---

[6] In *Davis*, the Court, in a single opinion, decided both *Davis*, which involved the admissibility of the unavailable declarant/complainant's statements in a 9-1-1 call, and the companion case, *Hammon v. State*, ____ Ind ____ , 829 NE2d 444, *cert allowed*, ____ US ____ , 126 S Ct 552, 163 L Ed 2d 459 (2005), which involved the admissibility under *Crawford* of the unavailable declarant/complainant's statements to police responding to a complaint of a "domestic disturbance."

"Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.[1]

"[1] Our holding refers to interrogations because, as explained below, the statements in the cases presently before us are the products of interrogations—which in some circumstances tend to generate testimonial responses. This is not to imply, however, that statements made in the absence of any interrogation are necessarily nontestimonial. The Framers were no more willing to exempt from cross-examination volunteered testimony or answers to open-ended questions than they were to exempt answers to detailed interrogation. * * * And of course even when interrogation exists, it is in the final analysis the declarant's statements, not the interrogator's questions, that the Confrontation Clause requires us to evaluate."

*Id.* at _____ , _____ n 1, 126 S Ct at 2273-74, 2274 n 1.[7]

The Court then applied that formulation to determine "whether, objectively considered, the interrogation that took place in the course of the 911 call produced testimonial statements." *Id.* at _____ , 126 S Ct at 2276.[8] Specifically, the Court compared the interrogation in *Davis* to the formal police interrogation in *Crawford* and focused on several significant differences. *Id.* at _____ , 126 S Ct at 2276-77. *First*, the victim in *Davis* spoke "about events *as they were actually happening*, rather than 'describ[ing] past events[.]' " *Id.* at _____ , 126 S Ct at 2276 (quoting *Lilly v. Virginia*, 527 US 116,

[7] In *Davis*, _____ US at _____ , 126 S Ct at 2274, the Court concluded that the *Crawford* rule applies *only* to "testimonial hearsay."

[8] The Court assumed, without deciding, that the 9-1-1 operator's acts were "acts of the police." *Davis*, _____ US at _____ n 2, 126 S Ct at 2274 n 2. Because the Court ultimately held that the statements derived from the 9-1-1 operator's "interrogation" were not testimonial, it did not address the issue of "when statements made to someone other than law enforcement personnel are 'testimonial.' " *Id.* Given our analysis and disposition, we indulge in the same assumption in this case.

137, 119 S Ct 1887, 144 L Ed 2d 117 (1999) (plurality opinion)) (emphasis and first brackets in original). In that regard, the Court noted that the victim in *Davis* spoke in the present tense. *Id.* at ___ , 126 S Ct at 2279.

*Second*, in a related sense, the victim in *Davis* faced a "bona fide physical threat" from the defendant's attacks. *Id.*

*Third*, the questions and answers in *Davis*, when "viewed objectively," were necessary "to be able to *resolve* the present emergency, rather than simply to learn (as in *Crawford*) what had happened in the past." *Id.* (emphasis in original). In that regard, the Court noted that learning the name of the defendant was necessary to establish the severity of the situation (to establish, for example, whether the defendant was a violent felon). *Id.*

*Fourth*, and finally, the Court noted that "the difference in the level of formality between [the questioning in *Davis* and the questioning in *Crawford*] is striking." *Id.* at ___ , 126 S Ct at 2276-77. That is, unlike the declarant in *Crawford*, who "was responding calmly, at the station house, to a series of questions," the declarant in *Davis* gave "frantic answers" over the phone, in an environment that was not tranquil or "even * * * safe." *Id.* at ___ , 126 S Ct at 2277.

Given the totality of those circumstances, the Court in *Davis* concluded that the victim's statements to the 9-1-1 operator were nontestimonial:

> "A 911 call, * * * and at least the initial interrogation conducted in connection with a 911 call, is ordinarily not designed primarily to establish or prove some past fact, but to describe current circumstances requiring police assistance.
>
> "* * * * *
>
> "We conclude * * * that the circumstances of [the declarant's] interrogation objectively indicate its primary purpose was to enable police assistance to meet an ongoing emergency. She simply was not acting as a *witness*; she was not *testifying*. * * * No 'witness' goes into court to proclaim an emergency and seek help."

*Id.* at ____, 126 S Ct at 2276-77 (internal quotation marks and brackets omitted; emphasis in original). The Court cautioned, however, that a nontestimonial interrogation may "evolve" into a testimonial interrogation in some cases:

> "In [*Davis*], for example, after the operator gained the information needed to address the exigency of the moment, the emergency appears to have ended (when [the defendant] drove away from the premises). The operator then told [the declarant] to be quiet, and proceeded to pose a battery of questions. It could readily be maintained that, from that point on, [the declarant's] statements were testimonial, not unlike the 'structured police questioning' that occurred in *Crawford*, 541 US at 53 n 4. * * * [T]rial courts will recognize the point at which, for Sixth Amendment purposes, statements in response to interrogations become testimonial. Through *in limine* procedure, they should redact or exclude the portions of any statement that have become testimonial, as they do, for example, with unduly prejudicial portions of otherwise admissible evidence."

*Id.* at ____, 126 S Ct at 2277.

The Court then proceeded to consider the admissibility of the unavailable declarant's statements to police responding to a "domestic disturbance" call as presented in the companion case, *Hammon v. Indiana*. In *Hammon*, when the officers arrived, the complainant was outside, and the defendant was inside. The complainant assured the officers that "nothing was the matter." *Id.* at ____, 126 S Ct at 2272. The officers went inside and questioned both the complainant and the defendant. During the officers' questioning of the complainant, the defendant attempted to interject his own comments on a number of occasions. In response, the officers separated the two and continued their questioning of the complainant outside the presence of the defendant. The complainant then told the officers, and affirmed in a "battery affidavit," that the defendant had pushed her, punched her, and pushed her face into broken glass. *Id.* at ____, 126 S Ct at 2272-73.

At the defendant's trial, the complainant, although subpoenaed, did not appear. The trial court, over the defendant's objection, admitted the testimony of one of the investigating officers recounting the complainant's statements, as well as the affidavit. *Id.* at ____, 126 S Ct at 2272.

In determining whether those statements were testimonial, the Court applied the same considerations that it had with respect to the 9-1-1 call in *Davis*. First, the officers asked the complainant about "how potentially criminal past events began and progressed." *Davis*, ___ US at ___, 126 S Ct at 2278. Second, according to the complainant herself, there was no present emergency needing resolution (the events at issue had occurred "some time" before the officers arrived). *Id.* Indeed—and unlike in *Davis*—the police were physically present when the declarant in *Hammon* made her statements. Third, the interrogation took place in a "formal" questioning environment, *viz.*, the complainant and the defendant were "actively separated" during the questioning and the complainant's statements "deliberately recounted" the events. *Id.*

Given those circumstances, the Court concluded that the interrogation "was part of an investigation into possibly criminal past conduct," *id.*, as opposed to the interrogation in *Davis*, which was for the purpose of alleviating an "ongoing emergency," *id.* at ___, 126 S Ct at 2273. Thus, the Court concluded that the admission of the unavailable declarant's statements in *Hammon* violated the confrontation clause.

To reiterate: Under *Davis*, the proper inquiry is whether the totality of the "circumstances objectively indicat[e] that the primary purpose of the interrogation [was] to enable police assistance to meet an ongoing emergency." ___ US at ___, 126 S Ct at 2273. From the Court's analysis, we understand that several considerations bear on that inquiry. *First*, what is the temporal relationship between the statements and the events described? That is, were the events "actually happening" as the statements were made, or did the statements recount "past events" after "some time" had passed? *Second*, did the exchange between the police and the declarant relate, logically and practically, to the immediate identification of, and response to, an emergency—as opposed to investigating past criminal conduct and developing information for purposes of possible future prosecution? *Third*, how "formal" was the questioning? Did the questioning take place in a police station, in an isolated room, or on the phone? Were the declarant's statements "frantic" or "deliberate"?

Applying those considerations, we conclude that Carder's statements in response to the 9-1-1 operator's initial question ("Is there a problem there?") and to the operator's subsequent questions about the nature and seriousness of Carder's injuries are not testimonial for purposes of the Sixth Amendment. We further conclude that the evidence of the balance of Carder's statements during the 9-1-1 call and to the police officers was merely cumulative of other, properly admitted evidence. Consequently, even assuming that those statements were testimonial, any error in admitting them was harmless beyond a reasonable doubt. *Chapman v. California*, 386 US 18, 23-24, 87 S Ct 824, 17 L Ed 2d 705 (1967); *Cook*, 340 Or at 544; *State v. Miles*, 208 Or App 252, 256-58, 145 P3d 242 (2006).

As described above, 208 Or App at 579, Carder called 9-1-1 about one minute after the assault occurred. For unknown reasons, she hung up and the 9-1-1 operator called back. The operator's first question when Carder answered was, "Is there a problem there?" Carder explained that her "boyfriend" hit her but that he had since left the house. After that initial question, the operator asked additional questions, including asking where defendant had gone, and then proceeded to ask questions calculated to assess whether Carder needed medical assistance. The operator first asked if Carder needed medical attention, and, when Carder did not answer, the operator asked where Carder had been hit. Carder responded that she had been hit in the eye but that she did not need immediate medical assistance. During the initial exchange, Carder's voice was shaking and she was crying. It was only after the initial questioning that Carder began to calm down and that the operator was able to gather other identifying information about defendant, including his name, his driver's license number, and his physical description.

We begin by assessing the temporal proximity of the 9-1-1 exchange to the assault. Unlike the declarant in *Davis*, Carder did not call 9-1-1 as the assault was taking place. However—and unlike the declarant in *Hammon*—Carder made her 9-1-1 statements immediately after the assault occurred. Specifically, Carder called within about one minute of the attack, just after defendant left the residence, and the 9-1-1 operator immediately called back. The close temporal

proximity in this case, though not identical, is much closer to the circumstances in *Davis* than to *Hammon* or *Crawford*. Further, the circumstances here demonstrate that, although Carder was referring to "past" events, the danger of a renewal of the domestic assault had not necessarily or fully abated. Defendant had just left; he could easily have returned before the police could arrive. The emergency was still real. *Accord Davis*, \_\_\_ US at \_\_\_ , 126 S Ct at 2279 (noting that the declarant in *Hammon* was "protected [by the police]" at the time she made statements).

The 9-1-1 operator's initial inquiries and her questions concerning the nature and extent of Carder's injuries were logically and practically calculated to determine whether an emergency existed and the nature and extent of Carder's need for immediate assistance. Here, as noted, the 9-1-1 operator called in response to a 9-1-1 hangup, a circumstance that might well evince a need for immediate police or medical assistance. The operator, through her first, open-ended question, sought to learn whether such an emergency existed. The operator's later questions regarding Carder's physical condition (*e.g.*, where she had been hit) were directed to assessing Carder's need for medical assistance. To be sure, those questions yielded responses substantiating defendant's criminal culpability, but they were not asked for criminal investigative purposes.

Although the 9-1-1 operator's purpose in asking the questions is patent, Carder's subjective intent in responding to those questions is unclear. It may be that she intended to report a crime and to provide police with information prompting and supporting a prosecution. Or it may be, as seems more likely, that Carder was badly frightened and upset by the assault and was, in fact, seeking assistance against a possible renewal of the assault. *Compare Davis*, \_\_\_ US at \_\_\_ , 126 S Ct at 2276 (characterizing the declarant's call as "plainly a call for help against bona fide physical threat"). In all events, under *Davis*, as noted, the dispositive distinction between testimonial and nontestimonial statements made in the course of police interrogations is "the primary purpose *of the interrogation.*" *Davis*, \_\_\_ US at \_\_\_ , 126 S Ct at 2273 (emphasis added).

Finally, we consider the "level of formality" of the 9-1-1 call. Here, as in *Davis*, Carder's answers to the 9-1-1 operator's initial questions were "frantic." *Davis*, ____ US at ____ , 126 S Ct at 2277. She was crying, and her voice was shaking. As in *Davis*, the "environment" was anything but "tranquil." *Id.* Defendant had left the house about a minute before the call was made, and Carder was clearly still frightened. Those circumstances, in their totality, materially distinguish the "level of formality" of the exchange here from the interrogations in *Crawford* and *Hammon*.

We thus conclude that Carder's initial answer to the 9-1-1 operator, *viz.*, "[M]y boyfriend hit me," and her subsequent responses to the operator's questions regarding the nature of her injuries, *viz.*, "[He hit me] [i]n my eye," were nontestimonial for Sixth Amendment purposes and, thus, were properly admitted.

■  Even assuming that the balance of Carder's statements during the 9-1-1 call and to the responding police officers were testimonial, any error in admitting those statements was harmless beyond a reasonable doubt. *See Cook*, 340 Or at 544. In particular, those other statements were either immaterial or their content was cumulative of other properly admitted evidence.

As noted, during the 9-1-1 call and in later speaking to police officers, Carder identified defendant by name and driver's license number, described the events leading up to the assault, described the assault itself in more detail, and stated that defendant had been convicted of "family violence" before. *See* 208 Or App at 579. Defendant argues, particularly, that his identity and the fact that he had previously been convicted of assaulting the same victim were material to his conviction of felony fourth-degree assault under ORS 163.160. Defendant is correct—however, other, uncontroverted evidence in the record established the same facts.

As noted, defendant testified on his own behalf.[9] In his testimony, defendant admitted that he was the "boyfriend" Carder spoke of, that they had been in an argument

_____

[9] In *State v. McGinnis*, 335 Or 243, 251, 64 P3d 1123 (2003), the court refused to

on the night of the assault, that they had physically struggled when Carder answered the phone, and that, ultimately, Carder had accused him of hitting her in the eye. In addition, defendant admitted that he had been convicted of assaulting Carder in the past. The only material difference between defendant's testimony and Carder's out-of-court statements is that defendant denied hitting Carder as she had alleged.

Additionally, the police officers, Teeny and Sanders, both testified concerning their personal observations of Carder's injuries. As corroboration of that testimony, the state introduced photographs of Carder's eye taken on the night of the assault. The state also introduced copies of the prior assault complaint against defendant, naming Carder as the victim, and the prior judgment of conviction. In sum, regardless of the admissibility of the balance of Carder's statements, any error was necessarily harmless.

Affirmed.

---

"adopt a rule providing that, when a criminal defendant testifies at trial in response to evidence that the state erroneously has introduced, the defendant's testimony cannot be used in a harmless error review, unless the state can show that the defendant would have testified regardless of the trial court's alleged error in admitting the state's evidence."

Instead, the court held that a defendant's testimony may be used in such a circumstance. *Id.*