1

Argued and submitted June 14, 2006, affirmed February 14, 2007

# STATE OF OREGON,
*Respondent,*

*v.*

# JUSTIN PAUL BECKER,
*Appellant.*

# C993166CR; A119949

153 P3d 158

Michael Curtis argued the cause for appellant. With him on the briefs was Curtis & Correll.

Janet Metcalf, Assistant Attorney General, argued the cause for respondent. With her on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Before Edmonds, Presiding Judge, and Brewer, Chief Judge,* and Wollheim, Judge.

EDMONDS, P. J.

---

* Brewer, J., *vice* Richardson, S. J.

## EDMONDS, P. J.

Following a trial to the court, defendant was convicted of several counts of rape and sexual abuse, all involving his younger sister, who was nine years old when the abuse began. He appeals his convictions and sentence, raising three assignments of error. We write to address only his first assignment of error, rejecting the others without discussion. For the reasons explained below, we affirm.

We take the facts from the record and from the trial court's extensive findings. In July 1999, the victim—who was then 14 years old—called her boyfriend's mother, Olvera, and told her that she wanted to come over. The victim was upset when she arrived. She told Olvera that her father had slapped her, choked her, and called her names. After talking about her father, the victim began to cry and told Olvera that her brother—defendant—was "being sexual with her." The victim told Olvera that she had told a friend about the abuse, but that she was afraid to tell her parents because she feared that they would hate her and that defendant would go to jail. Olvera urged the victim to report the abuse to authorities, but the victim was reluctant.

While the victim was still present, Olvera decided to report the abuse herself. She called the Washington County Sheriff's Office, and Deputy Larson responded. Larson transported the victim in his police car to the sheriff's office so that she could be interviewed by Detective Oswald. Larson testified that, during the automobile trip, the victim disclosed defendant's crimes to him:

> "She said that [defendant] had been doing things to her that she did not want since she was nine years old, and that the last occurrence was approximately one week ago. She also told me that she told him that she did not like it and that she did not want him to do it."

The victim also asked Larson not to take her home "because she did not want to die."

Oswald interviewed the victim when she arrived at the sheriff's office. The trial court, after explicitly finding

Oswald credible, found that the victim told Oswald, among other things:

"a)   that [defendant] had engaged in sexual contact with her[;]

"b)   that the sexual contact began when she was nine (9) years old and still continues to occur[;]

"\* \* \* \* \*

"f)   that [defendant] had touched her breasts about 30 times and had touched her 'bare crotch' about 15 times[;]

"g)   that twice while engaged in such contact, [defendant] had also 'masturbated himself' and had ejaculated[;]

"h)   that after the family moved to their current residence, [defendant] began having sexual intercourse with [the victim;]

"i)   that [defendant] had sexual intercourse with [the victim] on eight (8) different occasions[;]

"j)   [the victim] stated she was positive intercourse had occurred eight (8) times and stated [defendant] had worn a condom[;]

"k)   that twice while engaged in sexual contact, [defendant] had also placed [the victim's] hand on his own genitals[;]

"\* \* \* \* \*

"n)   that she [the victim] was afraid [the situation/ telling about it] would break up her family and make her parents and brother mad[;]

"o)   that she had told her friend [A] that this was occurring[; and]

"\* \* \* \* \*

"u)   that she was tired of her brother touching her and wanted him to stop[.]"

The victim told Oswald that she had not disclosed the abuse earlier because defendant told her not to, because she thought the abuse was partly her fault (as she had not stopped it), because she was afraid that disclosure would break up her family, and because she thought her parents

would be mad at her. She explained that she finally disclosed what had occurred because she was tired of defendant touching her; she felt that she was acting out because of the abuse and was getting in trouble for it; and, on that particular day, she was upset with her father.

After the interview, Oswald recontacted the victim and, the trial court found, he "advised her of the seriousness of her allegations, the importance of telling the truth and that now was the time to tell Oswald [if anything she'd previously said was untrue]." (Bracketed material by trial court.) "In response," the trial court found, the victim "reiterated that her brother had been having sex with her." Oswald testified that the victim "was very insistent that [defendant] had had sex with her."

The victim's friend, A, also testified. The court explicitly found her testimony to be credible. She stated that the victim had told her that defendant had raped her and had taken photos of her. Although the friend was shocked by what the victim told her, she did not tell anyone pursuant to the victim's request.

About two weeks after his interview of the victim, Oswald referred the victim to CARES Northwest for an evaluation. CARES is a child abuse assessment and intervention program. *See State v. Sanchez-Cruz*, 177 Or App 332, 335-36, 33 P3d 1037 (2001), *rev den*, 333 Or 463 (2002) (describing CARES program). Oswald told intake staff at CARES that the victim had been interviewed and that, therefore, he was requesting only a medical evaluation at CARES. A caseworker for the State Office for Services to Children and Families (SCF) (now the Department of Human Services) took the victim to CARES and was present during the evaluation.

The evaluation, conducted by a physician and a licensed clinical social worker, consisted of a review of background materials (a police report, an intake summary, and an SCF assessment) and an interview. From the start, the victim expressed reluctance to participate in the evaluation, and the evaluation was terminated after a short period without the usual physical examination or videotaped interview. The evaluators did, however, prepare a report (the CARES report) that was admitted into evidence at trial. The CARES

report includes a report by both evaluators and consists of a description of the background material that the evaluators considered, a description of the interview and the victim's statements, and "diagnostic findings" and treatment recommendations. Neither evaluator testified at trial.

When the matter came to trial, the victim recanted her allegations that defendant had abused her. She testified that (1) she did not remember telling Olvera about the abuse, (2) she had fabricated the allegations so that she could get out of her parents' house, (3) she never made the allegations, and (4) Olvera had made up the allegations and told her to repeat them. The trial court explicitly found that the victim's in-court testimony was not credible. As noted, the trial court ultimately found defendant guilty of one count each of first-degree rape, second-degree rape, and third-degree rape, and two counts of first-degree sexual abuse.

■ Defendant assigns error to the trial court's admission of the CARES report. He argues that admission of the report violated his rights under the Confrontation Clauses of Article I, section 11, of the Oregon Constitution and the Sixth Amendment to the United States Constitution.[1] Defendant relies on the decision in *Crawford v. Washington*, 541 US 36, 124 S Ct 1354, 158 L Ed 2d 177 (2004), in which the United States Supreme Court held that "the Confrontation Clause of the Sixth Amendment prohibits the 'admission of testimonial statements of a witness who did not appear at trial unless [the witness] was unavailable to testify, and the defendant had had a prior opportunity for cross-examination.' " *State v. Camarena*, 208 Or App 575, 582, 145 P3d 267 (2006) (quoting *Crawford*, 541 US at 53-54).

In light of defendant's arguments, it is necessary to identify the precise evidence that implicates defendant's Sixth Amendment right to confront his accusers. The CARES evaluators who wrote reports were Dr. Mary Steinberg and Penny VanNess, a licensed clinical social worker. VanNess's report largely summarizes the information that the evaluators received from the victim and other sources and includes

---

[1] Defendant presents no separate argument under Article I, section 11, so we treat his claim as one that admission of the CARES report violated his rights under the Sixth Amendment.

brief treatment recommendations. Our review of the information in that report does not reveal any evidence that was not admitted at trial through other sources. Steinberg's report recites that she reviewed reports from the Washington County Sheriff's Office and the Washington County SCF. The victim's medical history recounted in Steinberg's report was taken from the medical history questionnaire that the victim completed at the CARES facility. In general, Steinberg's report refers to the victim's medical history, describes the interview with the victim (including recounting some of the victim's statements to her), proposes treatment recommendations, and includes diagnostic findings. Those findings state that, "by history," the victim had made disclosures regarding possible sexual abuse to law enforcement personnel and SCF, and that the victim had acknowledged during the interview that she had had penile-to-genital contact with defendant. Also in the "diagnostic findings," Steinberg stated, "The history available to us today is highly concerning for sexual abuse."

At trial, defendant objected to the admission of the entire CARES report and, as noted, on appeal, he assigns error to the admission of the report as a whole. The state responds that much of the report cannot be challenged on Confrontation Clause grounds, as the information it contains was obtained from witnesses who testified at trial. For example, the author of the police report on which the evaluators relied testified at trial and was subject to cross-examination. Similarly, the victim herself testified at trial and was subject to cross-examination about the allegations that she had made to the evaluators. Moreover, the trial court—the trier of fact in this case—appears to have relied on the report's background information merely as the basis for the evaluators' opinions and not for the truth of the matter asserted therein. In addition, at oral argument on appeal, defense counsel conceded that his claim of error was limited to statements made by Steinberg and VanNess in their reports. We conclude that Steinberg's and VanNess's statements are the only portions of the CARES report that fall under the ambit of defendant's Sixth Amendment challenge.

"A federal constitutional error is harmless, such that the conviction will be upheld, 'if the reviewing court may confidently say, on the whole record, that the constitutional

error was harmless beyond a reasonable doubt.' " *State v. Cook*, 340 Or 530, 544, 135 P3d 260 (2006) (quoting *Delaware v. Van Arsdall*, 475 US 673, 681, 106 S Ct 1431, 89 L Ed 2d 674 (1986)). "Under the federal constitution, the state bears the burden to prove that the error was harmless beyond a reasonable doubt." *State v. Bates*, 203 Or App 245, 251, 125 P3d 42 (2005), *rev den*, 340 Or 483 (2006). Ordinarily, an expert's opinion that an alleged victim has suffered sexual abuse is highly probative evidence, but, as the Court explained in *Van Arsdall*, in determining whether an error is harmless, the court must consider the entire record, including "the importance of the [improperly admitted] testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, * * * and, of course, the overall strength of the prosecution's case." 475 US at 684.

In light of the above principles, we turn to the record in this case. Assuming without deciding that the admission of the CARES report was error under *Crawford*, we inquire whether the error was harmless beyond a reasonable doubt. As an initial matter, because this was a trial to the court, we have the benefit as a reviewing court of some insight into the factfinder's evaluation of the evidence. The trial court produced nine pages of written factual findings, including explicit credibility findings. Specifically, the court found Oswald to be credible in his recounting of the victim's statements; it found Larson to be credible; it found the victim's friend, A, to be credible; and it found Olvera to be credible, noting that she "had no apparent motive to make up a story or tell [the victim] to lie." In contrast, the court found the victim's trial testimony and defendant's testimony denying that he abused the victim not credible. The CARES report is mentioned in the court's nine-page written findings only twice, briefly, and there is no mention in the court's findings of Steinberg's diagnostic impression.

Moreover, the trial court explained its view of the evidence over the course of 24 pages of transcript, making oral findings witness by witness. In those recitations, the court mentioned the CARES report only once and then, only to comment on Steinberg's statement that, when she asked

the victim whether she was concerned about becoming pregnant, the victim reported that defendant always wore a condom. The trial court concluded:

> "So when I line up all the same evidence and say, taking into account the fact that we know that [the victim] isn't always truthful, and lining up all these other things, do you believe that this happened, and the abuse happened? Absolutely. Absolutely. Not just beyond a reasonable doubt, but beyond that."[2]

Moreover, our review of the content of VanNess's report does not reveal any information that was not otherwise before the court through the testimony of other witnesses. The same characterization is accurate regarding Steinberg's report, except for her diagnostic finding that "[t]he history available to us today is highly concerning for sexual abuse." The victim disclosed her abuse to two sheriff's deputies, a friend, and her boyfriend's mother. Each of those witnesses testified at trial as to the victim's disclosures, and the trial court found each witness to be credible. In contrast, the trial court viewed the victim's trial testimony, in which she recanted, not to be credible: "[O]ne of the things that I noticed, and I'm sure we all did, is that [the victim's] testimony didn't make any sense."

In arguing that the claimed error was prejudicial, defendant observes that the state referred to Steinberg as an "absolutely essential witness." But that statement was made in the context of a discussion about scheduling witnesses, when it was anticipated that Steinberg would testify, and not regarding the brief statement in the CARES report. Defendant also emphasizes that the prosecutor referred to the CARES report in his opening statement and closing argument, but there is no suggestion from the court's oral and written findings that the CARES report generally—and Steinberg's diagnostic impression specifically—played a role in the court's determinations. For the above reasons, we conclude based on the record before us beyond a reasonable

---

[2] The trial court's willingness to make findings in this case, both oral and written, is exemplary. Such a practice should be considered to be instructive to other trial courts when sitting as triers of fact because it enhances and facilitates appellate review in the interests of justice.

doubt that the admission of the CARES report did not affect the trial court's verdict.

Affirmed.