Argued and submitted May 30, conviction on count 12, kidnapping in the second degree, reversed; remanded for resentencing; otherwise affirmed December 26, 2007

## STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

## NOEL REYES-MAURO,
*Defendant-Appellant.*

Multnomah County Circuit Court
030432092; A124599

175 P3d 998

Mary-Shannon Storey, Deputy Public Defender, argued the cause for appellant. With her on the brief were Peter Ozanne, Executive Director, and Peter Gartlan, Chief Defender, Office of Public Defense Services.

Kathleen Cegla, Attorney-In-Charge, Collateral Remedies and Capital Appeals, argued the cause for respondent. With her on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Before Landau, Presiding Judge, and Schuman and Ortega, Judges.

ORTEGA, J.

## ORTEGA, J.

Defendant appeals a judgment of conviction of multiple counts of robbery, ORS 164.405; ORS 164.415, and one count of second-degree kidnapping, ORS 163.225. Among other challenges, he assigns error to the admission of certain testimony recounting out-of-court statements made by his codefendant, Ortega, as well as the denial of his motion for a judgment of acquittal on the kidnapping charge. We reject defendant's other two assignments of error without discussion, reverse defendant's conviction for second-degree kidnapping, and otherwise affirm.

Because we are called on to determine on the whole record whether the erroneous admission of certain testimony was harmless beyond a reasonable doubt, *State v. Cook*, 340 Or 530, 544, 135 P3d 260 (2006), we recount the evidence in some detail. Defendant's convictions arose from armed robberies of three stores in the span of four months: Tienda Jalisco, Tienda Chihuahua about five weeks later, and Tienda Mexicana Antonio two months after that. According to the testimony of the store clerks, in each robbery, two men entered the store around 9:00 p.m., close to the store's closing time. In each instance, the robbers, who spoke Spanish, ordered the clerk, at gunpoint, to open the cash register or safe. One man was about five feet three inches tall and the other was a little taller.

Each store clerk testified that the shorter robber ordered her around. In the first robbery, the shorter man told the clerk what to do and gave more commands than the taller robber did. In the second robbery, the shorter man was the first to speak, telling the clerk that it was a robbery, ordering her not to move, and telling her to open the cash register. In the third robbery, the shorter man ordered the store clerk to open the cash register, while the taller robber ordered the other people in the store not to move.

In each incident, the robbers wore dark clothing and big jackets. The victims testified that, in the Tienda Jalisco and Tienda Chihuahua robberies, the robbers' faces were covered with bandanas or dark hats with eyeholes. The clerks from those stores testified that the robbers were in their early

twenties. In the Tienda Mexicana Antonio robbery, the men wore sunglasses, but their faces were not otherwise covered; the clerk from that store testified that the robbers had mustaches but not beards. She also testified that the shorter robber wore a black jacket that went down to his knees. She identified defendant as having a mustache, height, and physical build similar to that of one of the robbers.

According to the victims' testimony, the guns used in the three robberies were different. In the Tienda Jalisco robbery, the robbers used a single black revolver, held by the shorter man. In the Tienda Chihuahua robbery, both robbers had guns; one was a large silver-colored pistol, and the other was black. In the Tienda Mexicana Antonio robbery, the robbers had guns that the clerk described as "long weapons, like ones that soldiers would use."

A customer, Chavaria, entered the store while the Tienda Chihuahua robbery was in progress. He testified that, when he arrived, the clerk and the two robbers were in the office in the back of the store, where the store's safe was located. Not seeing anyone in the front of the store, Chavaria called out for whomever was in the store. The taller of the robbers came out and pointed a silver-colored gun at Chavaria. The robber told Chavaria in Spanish to get down on the floor, but, as Chavaria was preparing to do so, the robber ordered him to get up and directed him to the office. Chavaria could not see the people in the office until he reached it. The clerk testified that the robbers seemed confused and nervous and that they dropped some of the money that they took from the safe. Threatening to shoot, the robbers ordered Chavaria and the clerk to stay on the floor and not to pursue them.

In a photograph of defendant that was taken, according to defendant's ex-girlfriend Kyle, near the time of the Tienda Chihuahua robbery, defendant is shown holding a gun. When shown the photograph, Chavaria could not be sure that the gun in the picture was the same as the gun used by the robber, but thought that it was similar. Kyle testified that the gun in the photograph belonged to defendant, that he usually kept it loaded, and that he disposed of it about two weeks after the robbery. Defendant acknowledged that the

photo was taken around that time period, but denied that the gun was his, testifying that Ortega had lent it to him.

During the Tienda Mexicana Antonio robbery, the robbers took money and telephone calling cards. The cards were marked with a code and the clerk's handwritten initials. The store sells 100 to 150 of the cards per week. In a search of defendant's bedroom, police found cards like those taken from the store, marked with the clerk's initials. Defendant testified that Ortega gave him the cards a few days before the two were arrested.

The search of defendant's bedroom also yielded a clip for an assault rifle, a .762-caliber bullet, and a .25-caliber bullet. Defendant testified that he had found those items in the pocket of a jacket that Ortega had lent him and that he had taken them out, put them on the shelf in the closet, and forgotten about them. According to the officer who interviewed him, when defendant consented to the search of his bedroom, he told police that he had an AK-47 assault rifle. Although the officer who interviewed him testified that they communicated effectively, defendant testified that he had difficulty communicating with the officer because of regional differences in vocabulary and that he had said only that he wanted to purchase guns.

As to identification by physical appearance, defendant testified that he normally had a beard (although he had shaved it off a week before trial), and a photograph taken six days after the third robbery depicts him with a mustache and a small goatee, contrary to the store clerk's description of robbers with mustaches only. Nevertheless, the store clerks' descriptions of the robbers were generally consistent with the appearance of defendant and Ortega. Defendant is 24 years old. At the time of the robberies, defendant and Ortega were friends and spent a lot of time together. Ortega is about five feet six or seven inches tall, and defendant is a bit shorter, about five feet two or three inches tall.[1]

---

[1] Although the prosecutor measured defendant with a yardstick during trial, he apparently made a mathematical error: he measured defendant in two stages and apparently left out six inches when he added the measurements, ultimately describing defendant's height as four feet 11 inches tall while wearing shoes. Other witnesses and the measurement listed on one of defendant's exhibits indicate that his height is five feet two or three inches.

Defendant's clothing was consistent with the descriptions of the robbers' clothing. He usually wore dark clothing and liked big black jackets. Kyle testified that defendant left two black and blue stocking-style hats with eyeholes at her home, but she threw them away about a week before they broke up, about two months before defendant's arrest. She admitted that she did not immediately tell detectives investigating the robberies about having thrown away the hats. Police found a black bandana with eyeholes hanging from the rearview mirror in defendant's father's car, which (according to Kyle) defendant often drove. Defendant testified that Ortega had given him the bandana and that he had never really looked at it. Police found in defendant's bedroom four black jackets, one of which fell to defendant's knees and was long enough to conceal an assault rifle, and a blue beanie-style knit cap. Defendant testified that two of the jackets were his, one belonged to Ortega, and the other had been loaned to him by a friend. He testified that the hat belonged to his five-year-old brother and offered a photograph of his brother wearing the hat. The hat apparently was easy to wear, though; both defendant and defense counsel tried it on and found that it fit.

In addition, Kyle's testimony linked defendant to two of the robberies. She testified that, about a week after the Tienda Jalisco robbery, she heard defendant and Ortega talking in Spanish about having stolen from a store. When Kyle inquired, defendant told her that, on New Year's Eve, he had robbed a store with a .38 revolver. Kyle had seen defendant with a .38 revolver, which he had passed on to someone else a week or so after he and Kyle started dating.

Kyle also testified about defendant's involvement in the Tienda Chihuahua robbery. According to her testimony, on the day of that robbery, she was in her apartment, which was near the store. At about 10:00 p.m., defendant, Ortega, and two other men came to the apartment. As soon as Kyle answered the door, the men entered, went into the bathroom, and locked the door. Kyle used a butter knife to pry open the door and then saw the men counting money and heard defendant counting out loud as he divided the money. She also saw defendant's silver gun, the same gun that Chavaria identified as similar to the one used in the robbery. The men stayed

in Kyle's apartment for two to four hours. There was a lot of police activity outside, and they were nervous. Defendant told Kyle that they had robbed the Tienda Chihuahua about 10 minutes before they came to the apartment. A few days later, defendant gave Kyle about $700 to buy a car and let her keep the money after the sale fell through.

Defense counsel questioned Kyle's ability to understand what defendant said and to remember events accurately. Kyle had no formal education in Spanish; however, she had learned the language from spending time with Spanish speakers while she was growing up, and, in fact, defendant spoke to Kyle in Spanish most of the time. On a scale from zero (no knowledge) to 100 (native speaker), she rated herself at 35 to 45 during the relevant time period. At the time of the pertinent events, Kyle was using marijuana and methamphetamine and drinking alcohol almost every day, although she had not been drinking or using drugs on the day of the Tienda Chihuahua robbery. She acknowledged that drug use impaired her ability to remember clearly.

Defendant also questioned Kyle's motives. Kyle and defendant had a contentious break-up between the time of the second and third robberies. Kyle first contacted the police about the robberies right after the relationship ended, shortly before the third robbery.

Additionally, defendant offered evidence contradicting Kyle's testimony on certain points. Defendant and his father, Reyes, contradicted Kyle's testimony that defendant was at a party at her home starting at around 11:00 p.m. on the night of the first robbery. Reyes identified defendant's voice on a videotape made at the family home between 10:19 and 10:22 p.m. that evening. As pertinent to the second robbery, at Tienda Chihuahua, the parties stipulated that a police detective, Towle, would testify that Ortega told him that Kyle did not see the gun on the evening of the robbery and did not use a butter knife to enter the bathroom.

Defendant testified that he did not commit any of the robberies. Reyes testified that defendant was with him at the time of the Tienda Jalisco robbery and that it would take about 25 minutes to get from the family's apartment to Tienda Jalisco.

On April 17, 2003, five days after the third robbery, police arrested defendant and Ortega as defendant was driving Ortega to work in Reyes's car. Defendant and Ortega were charged with various crimes. Ortega agreed to plead guilty to certain charges and to testify at defendant's trial. When called as a witness, however, he refused to testify about defendant's involvement in the crimes, despite being ordered by the court to do so. The trial court concluded that Ortega was unavailable as a witness and therefore allowed the state to offer testimony by a police officer, Rendon, regarding statements Ortega made during an April 2003 interview. That testimony is the subject of defendant's second assignment of error.

Rendon testified that Ortega reported the following. He and defendant had committed the first robbery, at Tienda Jalisco, armed, respectively, with a kitchen knife and a gun. There was one female employee in the store at the time of the robbery, which was around 9:00 to 10:00 p.m. Both men wore black stocking caps with eyeholes, and defendant also wore a bandana. After the robbery, the two men returned to defendant's residence. As to the second robbery, at Tienda Chihuahua, Ortega told police that he and defendant had not planned to rob the store but decided to do so while they were in a car with two other men. While the other men stayed in the car, defendant and Ortega went into the store. They had one gray and black gun, which defendant initially held. Defendant ordered the store clerk to go to the back room and open the safe. While they were in the back room, a customer came in. Ortega took the gun and ordered the customer to the back of the store. Defendant stuffed money into his shirt, dropping some. The men left the store, rejoined the two men in the car, and went to Kyle's apartment, about two blocks away. Once there, all four men divided up the money, and Kyle came into the bathroom while they were doing so. Finally, Ortega said that he and defendant committed the third robbery, at Tienda Mexicana Antonio, with an inoperable assault rifle. During that robbery, both men wore dark clothing, knit caps, and sunglasses. Defendant wore a thigh-length coat, made of a shiny black leather-like material. In addition to money, they took some $5 phone cards.

After Rendon testified to the above, defendant called police detective Towle to testify about statements that Ortega made during a September 2003 interview, which was provided pursuant to a plea agreement. Towle testified that Ortega made the following statements. During the first robbery, at Tienda Jalisco, defendant was armed with a black revolver, which did not contain any bullets and did not work properly. Ortega did not have a knife during that robbery; although that account was inconsistent with his statement in April, he did not explain the inconsistency. Ortega also changed his account of whether the assault rifle they had used was loaded: In April he stated that it was not loaded, but in September he said that it was. In the second robbery, at Tienda Chihuahua, four people were involved: Ortega, defendant, and two other younger men. During the third robbery, at Tienda Mexicana Antonio, only one weapon was used, and defendant had it; that account was consistent with Ortega's earlier statement but not with the witnesses' accounts. At defendant's request, Towle's testimony about Ortega's statements during the September interview was admitted as substantive evidence.

■       On appeal, defendant assigns error to the admission of Rendon's testimony about Ortega's statements. Defendant contends that admission of those out-of-court statements violated his rights under the Confrontation Clause of the Sixth Amendment to the United States Constitution, as interpreted in *Crawford v. Washington*, 541 US 36, 124 S Ct 1354, 158 L Ed 2d 177 (2004).[2] The state concedes that, under *Crawford*, admission of the evidence was erroneous, but argues that the error was harmless in light of the other evidence in the record. We agree with the state that, in light of the other evidence—particularly in light of Towle's testimony about other statements in which Ortega identified defendant as a participant in the three robberies—the error was harmless.

_____

[2] Although defendant argued to the trial court that admission of Ortega's statements would violate defendant's Confrontation Clause rights, the trial court did not have the benefit of guidance from *Crawford*, which was decided after defendant's trial.

■ ■   We analyze the violation of federal constitutional rights, such as the right to confront witnesses, under the federal harmless error test. *Cook*, 340 Or at 544. The deprivation of such a right is harmless error "only when the reviewing court, in looking at the record as a whole, can say that the error, beyond a reasonable doubt, has not contributed to the determination of guilt." *State v. Pitt (A120428)*, 212 Or App 523, 527, 159 P3d 329 (2007) (citations omitted). The Supreme Court in *Cook* summarized the analysis this way:

> "A federal constitutional error is harmless, such that the conviction will be upheld, 'if the reviewing court may confidently say, on the whole record, that the constitutional error was harmless beyond a reasonable doubt.' *Delaware v. Van Arsdall*, 475 US 673, 681, 106 S Ct 1431, 89 L Ed 2d 674 (1986) (describing the test announced in *Chapman* [*v. California*, 386 US 18, 87 S Ct 824, 17 L Ed 2d 705 (1967)]). In reviewing the whole record to determine whether an error was harmless, the court should consider 'the importance of the [improperly admitted] testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points * * * and, of course, the overall strength of the prosecution's case.' *Id.* at 684."

340 Or at 544 (second brackets and ellipsis in *Cook*).

We begin by identifying the particular evidentiary issue that is the subject of the harmless error analysis. *State v. Ennis*, 212 Or App 240, 262, 158 P3d 510, *rev den*, 343 Or 223 (2007). Here, there was no dispute that the crimes occurred basically as the victims described them. The issue instead was whether defendant was one of the perpetrators of the crimes. At oral argument in this court, defense counsel contended that Rendon's testimony was key evidence in the state's case because it identified defendant as one of the robbers. Accordingly, we focus on the evidence relating to that issue. *Cf. Cook*, 340 Or at 545 ("[The] defendant's conviction turned on the issue whether he shot the victims in defense of others; consequently, that issue must be the focus of our harmless error analysis.").

■     With respect to identification of defendant as a par-
ticipant in the crimes, Rendon's erroneously admitted testi-
mony was cumulative of Towle's testimony. Cumulative evi-
dence generally does not contribute to the determination of
guilt. In *State v. Camarena*, 208 Or App 575, 145 P3d 267
(2006), *rev allowed*, 342 Or 523 (2007), we considered
whether the admission of statements by an unavailable
witness—a domestic violence victim who made statements to
a 9-1-1 operator and police about an assault by the defen-
dant—was harmless error. Assuming that some of the state-
ments were testimonial and should not have been admitted
under *Crawford*, we nevertheless concluded that any error
was harmless because the statements were "either immate-
rial or their content was cumulative of other properly admit-
ted evidence." *Camarena*, 208 Or App at 590.

     Although the out-of-court statement recounted in
Rendon's testimony contained more details than the one
recounted by Towle, those details were not crucial or unique
parts of the state's case.[3] *Cf. Pitt*, 212 Or App at 527 (where
all of the state's evidence was ultimately derived from state-
ments made by two child victims, erroneously admitted
videotaped interviews of the children were "a crucial and
unique part of the state's case" because they allowed the jury
to make a first-hand assessment of the children's credibility).
Rather, as in *Camarena*, 208 Or App at 590-91, the material
details provided in Rendon's testimony were also established
by other evidence, including the victims' descriptions of the
robberies and the robbers' appearance; evidence about cloth-
ing worn or possessed by defendant; Kyle's testimony that
defendant confessed to the Tienda Jalisco and Tienda
Chihuahua robberies and that, immediately after the Tienda

---

[3] Towle's testimony recounting Ortega's statements included some details cor-
roborated by other evidence. Specifically, Towle's testimony was consistent with
testimony of the Tienda Jalisco clerk that the shorter robber had a black revolver.
The testimony that Ortega, defendant, and two other men were involved in the rob-
bery of the Tienda Chihuahua was consistent with Kyle's testimony that the four
men hid in her apartment to divide the money after the robbery. Although the tes-
timony that defendant had the only gun used during the Tienda Mexicana Antonio
robbery was not consistent with witness accounts that both men were armed, the
identification of defendant as one of the robbers was corroborated by the store
clerk's testimony that defendant's mustache, height, and physical build were con-
sistent with those of one of the robbers, and also was corroborated by the physical
evidence found in defendant's room.

Chihuahua robbery, defendant and others hid in her apartment and divided up money; the Tienda Mexicana Antonio clerk's testimony that defendant's appearance was consistent with that of one of the robbers; and the evidence found in defendant's bedroom—telephone cards like those taken from Tienda Mexicana Antonio (including the clerk's handwritten initials), ammunition for an assault rifle, and a knee-length black jacket.[4]

As set forth above, the prosecution's overall case was strong. Although defendant denied involvement in the robberies and his father provided him with an alibi for the Tienda Jalisco robbery, the jury must have disbelieved that testimony when it found defendant guilty. Subtracting Rendon's testimony from the evidence does not change its weight in a way that would cause the jury to lend greater credence to defendant's or Reyes's testimony or less credence to the other evidence in the case. Although the statements recounted in Rendon's testimony occurred before Ortega entered into a plea agreement and the statements recounted in Towle's testimony occurred in relation to the agreement, Towle's testimony made it clear that Ortega had given earlier statements that were largely consistent with the statements that Towle recounted. There was no evidence that Ortega changed his statements insofar as those statements identified defendant as the other participant in the robberies. Indeed, in closing argument, although defense counsel contended that Ortega must have declined to testify about defendant at trial because that testimony would be false, counsel acknowledged that, before trial, Ortega had consistently identified defendant as a participant in the crimes. The exclusion of Rendon's testimony about Ortega's April statements, therefore, would not have changed the result. The error in admitting that testimony was harmless beyond a reasonable doubt.

---

[4] Although Ortega's September statements as recounted by Towle were inconsistent in part (as to whether Ortega had a knife during the Tienda Jalisco robbery and as to whether the assault rifle was loaded) with the earlier interview described by Rendon, the inconsistencies related to matters other than the identification of defendant and did not contradict the victims' account of events. The victims' testimony did not address whether Ortega had a knife or whether the rifle was loaded.

■       We turn to defendant's challenge to the denial of his motion for a judgment of acquittal on the kidnapping charge. That assignment of error concerns his conviction for kidnapping Chavaria during the Tienda Chihuahua robbery. At trial, defendant contended in part that the movement of Chavaria was "merely incidental" to the robbery. He renews that argument on appeal, contending that the evidence was insufficient to allow a rational jury to find that he intended to interfere substantially with Chavaria's personal liberty. The state responds that the evidence that Chavaria was moved at gunpoint from the front of the store to the back office was sufficient to allow a rational jury to find that defendant had the requisite intent. Viewing the evidence in the light most favorable to the state, *State v. Wolleat*, 338 Or 469, 471, 111 P3d 1131 (2005), we conclude that the evidence was insufficient and therefore reverse.

        ORS 163.225(1) establishes the elements of second-degree kidnapping:

> "A person commits the crime of kidnapping in the second degree if, with intent to interfere substantially with another's personal liberty, and without consent or legal authority, the person:

> "(a)   Takes the person from one place to another; or

> "(b)   Secretly confines the person in a place where the person is not likely to be found."

The Supreme Court interpreted the mental state required by that statute in *Wolleat*. There, the defendant grabbed the victim by her hair and dragged her from one room to another in their home, a distance of 15 to 20 feet; he then repeatedly struck her. 338 Or at 471. Considering whether the defendant intended to interfere substantially with the victim's personal liberty, the court explained that, for the intended interference to be substantial, the defendant "must intend either to move the victim a 'substantial distance' or to confine the victim for a 'substantial period of time.' " *Id*. at 475. After considering the legislative history of the statute, the court concluded, "Moving a victim from one room to another while committing another crime does not constitute moving the victim a substantial distance. Put differently, that movement is not sufficient, by itself, to give rise to an intent to interfere

substantially with the victim's liberty to move freely." *Id.* at 478 (citation omitted). Because there was no evidence that the defendant intended either to transport the victim to a place of confinement or to move her farther than the 15 to 20 feet that he actually moved her, the evidence was insufficient to establish that mental state. *Id.* Although intent usually presents a jury question, the intended movement was too minimal for any reasonable jury to find the requisite intent. *Id.*

We addressed intent under different factual circumstances in *State v. Douglas*, 203 Or App 22, 125 P3d 751 (2005), *rev den*, 340 Or 157 (2006). In that case, the gun-wielding defendant and his accomplice forced three people who were standing outside a tavern to knock on the tavern's door so that the defendant and his accomplice could gain entry to the closed tavern. When the bartender opened the door, the defendant and his accomplice forced the patrons into the tavern, took money from the safe and till, and ordered everyone in the tavern to move 25 to 30 feet and then lie on the floor while the robbers fled. The defendant was convicted of six counts of second-degree kidnapping, one count for each of the three people who had been outside the tavern and one for each of the three people who had been inside. *Id.* at 24-25. Affirming the convictions relating to the victims who were forced from the street into the tavern, we explained:

> "The distinction from *Wolleat* is functional. Defendant's movement of the first group of victims was not 'merely incidental' to the robbery, as the movement in *Wolleat* was to the assault there. Defendant did not merely move those victims from room to room in the course of committing some other crime against *them*. Rather, defendant interfered with those victims' liberty in order to gain entry to the tavern and to commit other crimes against other persons located inside. That is, the kidnapping was a predicate crime—and therefore separate—the accomplishment of which was needed in order for defendant to get inside the building that he intended to rob."

*Id.* at 28 (footnote omitted; emphasis in original). We compared the kidnapping of those victims to a situation in which

a defendant robs one victim to obtain the combination for a safe at a second victim's house. *Id.* at 28 n 2.

As to the victims who were already inside the tavern—the bartender, his girlfriend, and an off-duty bartender—we concluded that moving them from one part of the bar to another was merely incidental to the robbery and thus was insufficient to support a kidnapping conviction. We considered the legislative history relied on in *Wolleat*, including statements that the requisite intent would not be established by taking a robbery victim from a front office to a back room to open a safe. *Douglas*, 203 Or App at 29 (citing *Wolleat*, 338 Or at 477 (quoting Minutes, Criminal Law Revision Commission, June 17, 1969, 20)). In light of that history, the movement was incidental, "given that the robbery was in progress at that point and the people inside the tavern were merely being ordered around the room to facilitate the robbery." 203 Or App at 29.

In view of those decisions, we consider whether taking Chavaria from the front of the store to the back office was merely incidental to the robbery of the store. We conclude that, unlike the movement of the tavern patrons in *Douglas* from outside to inside, the movement of Chavaria was not a separate crime. Rather, Chavaria walked into a crime scene and was ordered about the store in order to facilitate the ongoing robbery.[5] There was no evidence from which a reasonable jury could infer that the robbers moved Chavaria with the intent to interfere substantially with his personal liberty. Accordingly, the trial court erred when it denied defendant's motion for a judgment of acquittal on that count.

Conviction on count 12, kidnapping in the second degree, reversed; remanded for resentencing; otherwise affirmed.

---

[5] The elements of robbery, as pertinent here, include that the defendant,

"in the course of committing or attempting to commit theft * * * threatens the immediate use of physical force upon another person with the intent of:

"(a) Preventing or overcoming resistance to the taking of the property or to retention thereof immediately after the taking[.]"

ORS 164.395(1); *see also* ORS 164.405(1) (providing that violation of ORS 164.395 is an element of second-degree robbery); ORS 164.415(1) (providing that violation of ORS 164.395 is an element of first-degree robbery).